# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| GORDON JASON, JENNIFER NAPPO, and PATRICK MCLAUGHLIN, on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>    v.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, and Unnamed Affiliates & Associates 1-100,<br><br>       Defendants. | Case No. _____<br><br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

## CLASS ACTION COMPLAINT

1.     Plaintiffs Gordon Jason, Jennifer Nappo, and Patrick McLaughlin ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against State Farm Mutual Automobile Insurance Company, and Unnamed Affiliates 1-100 (collectively, "State Farm" or "Defendant") for breach of fiduciary duty, professional negligence, violation of state consumer fraud acts, unjust enrichment, and breach of the covenant of good faith and fair dealing, with respect to life insurance policies and annuity contracts sold by State Farm agents pursuant to an agreement with PHL Variable Insurance Co. f/k/a The Phoenix Companies, Inc. ("Phoenix" or "PHL Variable"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on their personal knowledge.

## NATURE OF THE ACTION

2.     This is a class action on behalf of all persons in the United States who were solicited, induced, and/or targeted by State Farm agents to purchase life insurance policies or annuity contracts offered by The Phoenix Companies, Inc. (the "Phoenix Products"), and did purchase the Phoenix Products.[1]

3.     Defendant State Farm occupied and assumed a unique position of trust and confidence with Plaintiffs and Class Members concerning their Phoenix Products, including those related to estate planning. Defendant targeted Plaintiffs and Class Members in connection with these Phoenix Products and represented the Products as safe and secure investments.

4.     Defendant abused its position of trust. For more than a decade, Defendant

---

[1] Phoenix Products were subsequently transferred to PHL Variable Insurance Company through a series of restructuring transactions.

1

concealed real and imminent threats facing Plaintiffs' and Class Members' policies and contracts and associated benefits. Defendant knew the financial risk facing Phoenix and chose to keep silent so it could quietly pocket millions of dollars in compensation, to the detriment of Plaintiffs and Class Members.

5.      Plaintiffs and Class Members—many of which having maintained a relationship with State Farm and its agents for decades—were wholly unaware of these threats to their life insurance policies and annuity contracts. Nor would Plaintiffs and Class Members have reason to believe that Defendant, as the nation's largest casualty insurance provider, would choose to leave them in the dark.

6.      By the time Plaintiffs and Class Members became aware of their financial injury, it was too late. Defendant failed to warn and concealed material facts from Plaintiffs and Class Members. Today, PHL Variable Insurance Company ("PHL Variable") is in rehabilitation, and Plaintiffs and Class Members are unable to receive the full benefits due under their policies and contracts. Neither can they exchange or surrender their Phoenix Products for a suitable alternative.

7.      Despite paying hundreds of millions of dollars in premiums over the course of a decade, Plaintiffs and Class Members are left holding the bag, while Defendant profited handsomely as a result of its deceptive and violative conduct as detailed herein.

## JURISDICTION AND VENUE

8.      This Court has federal subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

9. This Court has personal jurisdiction over Defendant because it maintains its principal place of business in Illinois.

10. Venue is proper in this District because a substantial part of the events or omissions giving rise to Plaintiff Gordon Jason's claims occurred in this District and Plaintiff Jason resides in this District.

## THE PARTIES

11. Plaintiff Gordon Jason is an adult citizen and resident of the State of Illinois and is domiciled in Elmhurst, Illinois.

12. Plaintiff Jennifer Nappo is an adult citizen and resident of the State of California and is domiciled in Mountain View, California.

13. Plaintiff Patrick McLaughlin is an adult citizen and resident of the State of Missouri and is domiciled in Dawn, Missouri.

14. Defendant State Farm Mutual Automobile Insurance Company is incorporated in Delaware and has its principal place of business at One State Farm Plaza, Bloomington, Illinois 61710. Defendant is the largest property and casualty insurance provider and the largest auto insurance provider in the United States.

15. Unnamed Affiliates & Associates 1-100 include but are not limited to: any and all affiliates, assignees, subsidiaries, successors and transferees, officers, directors, partners, agents, agencies and employees, and all other persons acting or claiming to act on their behalf or in concert with Defendant, some of which upon discovery will be added to this Complaint.

## FACTUAL ALLEGATIONS

### A. The State Farm and Phoenix Agreement

16. In March 2001, Defendant State Farm entered into an agreement with PHL Variable

3

Insurance Co., f/k/a The Phoenix Companies, Inc. (the "Agreement").[2]

17.     The Agreement allowed The Phoenix Companies, Inc. "to provide various services to State Farm and its subsidiaries and policyholders, including estate, retirement, executive benefits and charitable gift planning. The agreement also offer[ed] [Phoenix] the opportunity to provide to State Farm's affluent customers, through qualified State Farm agents, additional life and annuity products and services not previously available from those agents."[3]

18.     Thus, the Agreement enabled State Farm to provide its agents with a more diverse range of life insurance products to sell.

19.     The Agreement also gave State Farm a competitive industry advantage.

20.     In a Form S-1 filed in May 2001, Phoenix notes that "[i]nsurance companies" like Defendant "have been moving their agents into an advisor/planner role, resulting in a need to provide their agents, particularly their top producers, with a more diverse range of life insurance products to sell. Insurance companies have responded to this need in part by negotiating arrangements with third party providers, including other insurance companies."[4]

21.     This Agreement and its offerings were unique for Defendant, especially in 2001. This is evinced by the fact that as late as 2007, Phoenix still said "[w]e are the *only* third-party

---

[2] https://www.sec.gov/Archives/edgar/data/1129633/000095012301501968/y44223a2s-1a.txt ("In addition, in March 2001 we entered into an agreement with a subsidiary of State Farm Mutual Automobile Insurance Company, ...."); *see also* https://www.sec.gov/Archives/edgar/data/1129633/000119312508043638/d10k.htm.

[3] https://www.sec.gov/Archives/edgar/data/1129633/000095012301501968/y44223a2s-1a.txt.

[4] https://www.sec.gov/Archives/edgar/data/1129633/000095012301502973/y44223a3s-1a.txt (emphasis added).

provider of life and annuity products and services at State Farm."[5]

22.     The Agreement was profitable for both Defendant and Phoenix. Phoenix explained in 2007 that in approximately six (6) years, "[s]ince [Phoenix's] relationship with State Farm began in mid-2001, it has generated **$290 million** in cumulative new total life premiums and **$1.2 billion** in annuity deposits."[6]

23.     Phoenix reported that the following compensation was paid to Defendant[7] from 2002 through 2009:

(a)     2002: $10.7 million[8]

(b)     2003: $25.8 million[9]

(c)     2004: $32.4 million[10]

(d)     2005: $37.6 million[11]

(e)     2006: $50.1 million[12]

(f)     2007: $62.3 million[13]

(g)     2008: $73.9 million[14]

---

[5] https://www.sec.gov/Archives/edgar/data/1129633/000119312508043638/d10k.htm (emphasis added).

[6] https://www.sec.gov/Archives/edgar/data/1129633/000119312508043638/d10k.htm.

[7] Compensation reported as being paid to entities which were "either subsidiaries of State Farm or owned by State Farm employees" or "owned by State Farm agents." *See infra* notes 8-15.

[8] https://www.sec.gov/Archives/edgar/data/1129633/000094937704000135/pnx_64997-10k.htm.

[9] https://www.sec.gov/Archives/edgar/data/1129633/000094937704000135/pnx_64997-10k.htm.

[10] https://www.sec.gov/Archives/edgar/data/1129633/000094937707000109/pnx80444-10k.htm.

[11] https://www.sec.gov/Archives/edgar/data/1129633/000094937707000109/pnx80444-10k.htm.

[12] https://www.sec.gov/Archives/edgar/data/1129633/000094937707000109/pnx80444-10k.htm.

[13] https://www.sec.gov/Archives/edgar/data/1129633/000111650210000184/pnx_10k.pdf.

[14] https://www.sec.gov/Archives/edgar/data/1129633/000111650210000184/pnx_10k.pdf.

(h)     2009: $29.3 million[15]

24.     Defendant held in-person seminars for prospective customers like Plaintiffs and Class Members, in which Defendant pitched Phoenix Products for estate planning and had its attorneys present.

25.     "During 2008, State Farm was [Phoenix's] largest distributor of annuity and life insurance products accounting for approximately 27% of [Phoenix's] total life insurance premiums and approximately 68% of [Phoenix's] annuity deposits."[16]

26.     Defendant chose to extend its profitable venture with Phoenix. In 2007, Phoenix "extended [its] agreement … to provide [] life and annuity products and related services to State Farm's affluent and high-net-worth customers, through qualified State Farm agents **until 2016**."[17]

27.     The Phoenix Agreement was an important source of risk-free revenue for Defendant, since its compensation came entirely in the form of commissions and Defendant did not need to set aside reserves, pay distribution expenses, incur underwriting costs, training costs, et cetera. This is evinced by the fact that, "[b]y the end of 2007, [Phoenix] had trained and certified approximately **10,700, or 95%, of State Farm's approximately 11,300 securities licensed agents to sell Phoenix products**."[18]

28.     Thousands of US households were solicited, induced, and/or targeted by State Farm agents and directed to acquire Phoenix life insurance policies or annuity contracts. Phoenix

---

[15] https://www.sec.gov/Archives/edgar/data/1129633/000111650210000184/pnx_10k.pdf.

[16] https://www.sec.gov/Archives/edgar/data/1129633/000111650209001703/pdfcopy-pnx_10q.pdf.

[17] https://www.sec.gov/Archives/edgar/data/1129633/000119312508043638/d10k.htm (emphasis added).

[18] *Id.*

explains that "[o]ur relationship with State Farm gives us potential access to approximately 39% of the high-net-worth households in the U.S. **In 2007, State Farm accounted for approximately 15% of our total life premiums and 62% of our annuity deposits**."[19]

29.    A subsidiary of State Farm Mutual Automobile Company was Phoenix's "largest individual distributor of life insurance[,]"[20] and State Farm was also one of Phoenix's "largest distributors of annuities" along with National Life Group.[21]

**B.     The State Farm and Phoenix Standstill and Shareholder's Agreements**

30.    In 2001, Phoenix's "underwriters [] reserved for possible sale to State Farm" millions of shares that, if purchased, would allow State Farm to "own approximately 4.9% of the outstanding common stock of The Phoenix Companies, Inc. immediately following the offering."[22]

31.    Phoenix "entered into a shareholder's agreement with State Farm that provide[d], among other things, for:

> -- the attendance of a **representative of State Farm at certain of [Phoenix] board and board planning committee meetings**, other than executive sessions; and
>
> -- the appointment of one or more **representatives of State Farm to an advisory committee** established by [Phoenix] to advise the management of [Phoenix Investment Partners, Ltd.] in connection with [Phoenix Investment Partners, Ltd.] business and operations."[23]

---

[19] https://www.sec.gov/Archives/edgar/data/1129633/000119312508043638/d10k.htm.

[20] *Id.* ("Our largest individual distributor of life insurance is a subsidiary of State Farm Mutual Automobile Company, or State Farm.").

[21] *Id.*

[22] https://www.sec.gov/Archives/edgar/data/1129633/000095012301502973/y44223a3s-1a.txt.
[23] https://www.sec.gov/Archives/edgar/data/1129633/000095012301503644/y44223b4e424b4.txt.

32.     Pursuant to a Standstill Agreement, "State Farm agreed, for a period ending June 25, 2006, subject to certain enumerated exceptions, that, without the prior approval of the State of New York Insurance Department, it would not, directly or indirectly, acquire, offer to acquire or agree to acquire any shares of Common Stock if, following such acquisitions, it would **beneficially own more than 4.9 percent** of the outstanding shares of such stock."[24]

33.     In 2002, Phoenix noted that after the initial public offering in which Defendant "acquired approximately 4.9% of [] outstanding shares of common stock[,]" Phoenix "commenc[ed] [a] subsequent stock repurchase program...."[25] Phoenix noted that "State Farm's ownership of [] issued and outstanding common stock **may increase to 6%** as a result of any such repurchase program ...."[26]

34.     Indeed, **State Farm owned more than "five percent of [Phoenix] outstanding common stock"** over the decade plus that Phoenix compensated State Farm for the sale of its insurance and annuity products.[27] And the Shareholder Agreement was in place the entirety of this period.[28]

**C.     Phoenix's Downgrade and State Farm's Suspension of Phoenix Product Sales**

35.     In 2009, State Farm suspended sales under the Agreement. This was significant

---

[24] https://www.sec.gov/Archives/edgar/data/1129633/000112963302000013/pnx2002_proxy.txt.

[25] https://www.sec.gov/Archives/edgar/data/1129633/000095012302011492/y66245sv3.htm

[26] *Id.*

[27] *See* supra notes 8-15; *see also infra* notes 41-46.

[28] https://www.sec.gov/Archives/edgar/data/1129633/000112963302000013/pnx2002_proxy.txt ("Shareholder's Agreement. .... Unless this agreement is terminated by agreement of the Company and State Farm or any of certain related agreements are terminated or breached, this agreement will remain in effect for as long as State Farm and its affiliates own at least 4.9 percent of the outstanding shares of Common Stock.").

because State Farm suspended sales seven (7) years before the Agreement's 2016 end date.

36.     State Farm suspended sales under the Agreement because Phoenix was downgraded and was no longer investment-grade.[29]

37.     In a Form 10-Q from 2009, Phoenix explained: "We have recently been downgraded and had our outlook revised adversely."[30]  Phoenix went on to explain:

- On September 8, 2009, Moody's Investor Services downgraded our financial strength rating of Baa2 to Ba1 and lowered our senior debt rating from Ba2 to B1. They maintained their negative outlook on all ratings.
- On August 6, 2009, Standard & Poor's downgraded our financial strength rating of BBB- to BB and lowered our senior debt rating from B+ to B-. They maintained their negative outlook on all ratings.
- On March 10, 2009, A.M. Best Company, Inc. downgraded our financial strength rating to B++ from A and downgraded our senior debt rating to bb+ from bbb and maintained its negative outlook.

These **downgrades have materially and adversely affected new sales, persistency, our relationships with distributors and our financial results, and have reduced our ability to borrow**. Further declines in ratings would likely also materially and adversely affect our sales, persistency, our relationships with distributors and our financial results.[31]

38.     This downgrading was highly significant and should have been a huge red flag for State Farm.  Phoenix's financial strength rating being downgraded from Baa2 to Ba1 changed

---

[29] "Moving from a 'BBB' rating, which is investment grade, to 'BB,' which is below investment grade, can have severe effects on the price and prospects of a company or government that issued the bonds. **A rating below investment grade indicates deteriorating fundamentals** in the issuing company or government." Adam Hayes, *Downgrade: What It Is, How It Works, and Warning Signs*, INVESTOPEDIA (last updated Dec. 30, 2023), available at www.investopedia.com/terms/d/downgrade.asp (emphasis added).

[30] https://www.sec.gov/Archives/edgar/data/1129633/000111650209001703/pdfcopy-pnx_10q.pdf.

[31] https://www.sec.gov/Archives/edgar/data/1129633/000111650209001703/pdfcopy-pnx_10q.pdf.

PHL's rating from that of "**Investment**-Grade" to merely "**Speculative**-Grade."[32]

39.     In light of the downgrade, "[i]n March 2009, State Farm Mutual Automobile Insurance Company ("State Farm") **suspended the sale of Phoenix products** pending a re-evaluation of the relationship between the two companies."[33]

40.     Defendant was aware of the Phoenix downgrade and Phoenix's financial troubles. Defendant and Phoenix restructured their agreement on July 30, 2009.[34]

41.     According to State Farm spokesman Dick Luedke, "[t]he primary reason [State Farm suspended sales of Phoenix insurance policies and annuities] is the recent financial strength downgrades by rating agencies[.]"[35]  State Farm "was responsible for 27 percent, or $91.6 million, of Phoenix's total new life insurance sales in 2008, measured by premiums."[36]

42.     Pursuant to the restructured Agreement, Defendant stopped selling Phoenix products.  Phoenix's Form 10-Q stated that "the restructured agreement does not provide for any new sales of our products through the State Farm distribution system."[37]

---

[32] *See, e.g.*, Moody's Investors Service, *Moody's Rating Symbols & Definitions* (May 2009), at 10, PDF available at https://www.moodys.com/sites/products/productattachments/moodys%20rating%20symbols%20and%20definitions.pdf.

[33] https://www.sec.gov/Archives/edgar/data/1129633/000111650209001703/pdfcopy-pnx_10q.pdf.

[34] https://www.sec.gov/Archives/edgar/data/1129633/000111650209001703/pdfcopy-pnx_10q.pdf.

[35] Diane Levick, *State Farm Suspends Sales Of Phoenix Cos. Products*, PROPERTY AND CASUALTY NEWS (Mar. 5, 2009), available at https://insurancenewsnet.com/oarticle/State-Farm-Suspends-Sales-Of-Phoenix-Cos-Products-a-103919.

[36] *Id.*

[37] https://www.sec.gov/Archives/edgar/data/1129633/000111650209001703/pdfcopy-pnx_10q.pdf.

43.    Nevertheless, Defendant and Phoenix "amend[ed] the existing agreement to clarify the service and support we will provide to customers who purchased their policies and contracts through a State Farm agent, as well as State Farm agents themselves."[38]

44.    Defendant's decision to continue providing services for pre-existing Phoenix policies and contracts—including those of Plaintiffs and putative Class Members—affected "approximately 90,000 inforce Phoenix policies and contracts sold through State Farm agents."[39]

45.    State Farm[40] continued receiving compensation in connection with those Phoenix life insurance policies and annuity contracts sold to Plaintiffs and Class Members. Phoenix reported the following compensation to State Farm in the years following the Phoenix downgrade:

(a)    2010: $4.4 to 4.6 million[41]

(b)    2011: $2.4 million[42]

(c)    2012: $2.3 million[43]

(d)    2013: $2.6 million[44]

---

[38] *Id.*

[39] *Id.*

[40] Compensation reported as paid to "entities that were either subsidiaries of State Farm or owned by State Farm agents." *see infra* notes 42-46, or "owned by State Farm employees," *see infra* note 41.

[41] "In 2010, our subsidiaries incurred total compensation of $4.4 million to entities which were either subsidiaries of State Farm or owned by State Farm employees, for the sale of our insurance and annuity products. During 2010, we made payments of $4.6 million to State Farm entities for this compensation." https://www.sec.gov/Archives/edgar/data/1129633/000119312511085807/ddef14a.htm.

[42] https://www.sec.gov/Archives/edgar/data/1129633/000112963314000005/pnx-20131231x10k.htm.

[43] *Id.*

[44] *Id.*

(e)    2014:  $2.7 million[45]

(f)    2015: $3.0 million[46]

46.    In 2016, Nassau Financial took The Phoenix Companies private.[47]  Part of this transaction included "PHL Variable Insurance Company ('PHL Variable'), one of Phoenix's operating subsidiaries."[48]  Phoenix Products were subsequently transferred to PHL Variable through a series of restructuring transactions. PHL Variable repeatedly experienced solvency problems from the time Defendant stopped selling Phoenix products, through PHL Variable's eventual administrative supervision and rehabilitation. *See infra* ¶¶ 50-67. Industry insiders, like Defendant, have been aware of material facts surrounding PHL Variable's financial troubles, which facts would have been known by Defendant and not consumers like Plaintiffs and Class Members.  Instead of sharing these material facts and issues, Defendant chose to conceal that material information from Plaintiffs and Class Members.

47.    Defendant's affirmative actions harmed the investments of Plaintiffs and Class Members. Defendant's decision to stop selling Phoenix products accelerated Phoenix's demise.

48.    State Farm never informed Plaintiff and Class Members who purchased the Phoenix

---

[45] https://www.sec.gov/Archives/edgar/data/1129633/000112963315000004/pnx-20141231x10k.htm.

[46] https://www.sec.gov/Archives/edgar/data/1129633/000112963316000029/pnx-20151231x10k.htm.

[47] *See, e.g.*, Kerry Pechter, *Double Trouble in the Bermuda Triangle*, RETIREMENT INCOME JOURNAL (May 30, 2024), https://retirementincomejournal.com/article/double-trouble-in-the-bermuda-triangle ("Once part of the Hartford-based Phoenix Companies, PHL became part of Nassau Financial in 2016, when Nassau, then only a year old, bought the publicly-traded Phoenix, took it private, and retired the Phoenix brand.").

[48] https://www.sec.gov/Archives/edgar/data/1129633/000157104916016107/t1601599_ex99-1.htm; *see also* https://doi.sc.gov/DocumentCenter/View/12789/PHL-Variable-Insurance-Company.

Products and services that (1) Phoenix had been downgraded; or that (2) State Farm stopped selling Phoenix Products.

49.    Upon information and belief, State Farm actively concealed Phoenix's financial troubles from Plaintiff and Class Members.

**D.    PHL Variable Insurance Co. and its Rehabilitation**

50.    On March 31, 2023, Connecticut Insurance Department (the "CID") "placed [PHL Variable] under an order of administrative supervision ... having determined that regulatory supervision was appropriate to help safeguard the financial security of" PHL Variable.[49]

51.    Over a year later, on May 20, 2024, PHL Variable and its subsidiaries, Concord Re, Inc. and Palisado Re, Inc. were ordered into Rehabilitation by the CID (the "PHL Rehabilitation").

52.    At the time, "**PHL ... ha[d] negative $900 million in capital and surplus**. Its 'aggregate assets [we]re projected to be exhausted in 2030' when 'approximately **$1.46 billion of policyholder liabilities will remain unpaid**,' according to the CID."[50]

53.    In connection with the PHL Rehabilitation, the CID determined that "further transaction of business would be financially hazardous to its policyholders, creditors and the public."[51]

---

[49] *See* Petition For Order Of Rehabilitation And Appointment Of State Insurance Commissioner As Rehabilitator Of PHL Variable Insurance Company, Concord Re, Inc., and Palisado Re, Inc. (May 17, 2024), available at https://retirementincomejournal.com/wp-content/uploads/2024/05/DocumentInquiry-PHL.pdf.

[50] Kerry Pechter, *Double Trouble in the Bermuda Triangle*, RETIREMENT INCOME JOURNAL (May 30, 2024), https://retirementincomejournal.com/article/double-trouble-in-the-bermuda-triangle/ (citing Petition for Order Of Rehabilitation and Appointment Of State Insurance Commissioner as Rehabilitator Of PHL Variable Insurance Company, Concord Re, Inc., and Palisado Re, Inc. (May 17, 2024)).

[51] May 20, 2024 Order, available at https://civilinquiry.jud.ct.gov/DocumentInquiry/DocumentInquiry.aspx?DocumentNo=27532057

54.     PHL Variable's rehabilitation would not have come as a surprise to Defendant, who was fully aware of financial troubles facing PHL Variable.

55.     As a result of the rehabilitation, the PHL Rehabilitator issued a Temporary Moratorium Order effective May 20, 2024, limiting policy withdrawals, surrenders and death benefit payouts to certain guaranty association cap limits.

56.     Plaintiffs and Class Members were immediately impacted by the Moratorium Order that was made permanent on June 25, 2024 and continues to this day.

57.     Plaintiffs and Class Members were immediately harmed. Plaintiffs and Class Members were and remain unable to obtain benefits to which they were entitled—despite paying hundreds of millions of dollars in premiums in connection with these benefits, and despite Defendant willingly concealing and omitting Phoenix/PHL Variable's impending insolvency so it could continue collecting commissions on these premiums.

58.     For example, Plaintiff Jennifer Nappo only received 15% of what she was owed under her term life insurance policy. Specifically, **Plaintiff Nappo collected just $300,001.76 of a $2,000,000 life insurance policy** after her late husband James Nappo passed.  James Nappo passed tragically on April 28, 2024, *before* the Moratorium Order went into effect and *after* the order of administrative supervision.

59.     Plaintiffs and Class Members were immediately harmed by the Moratorium Order which provided an aggregate limit of $300,000, "regardless of the … size" of the life insurance policy:

> *Aggregate Limit - Life Insurance Policies Covering One Individual*. Neither the General Account nor the Non-unitized Subaccount will individually or together pay more than $300,000 in the aggregate under one or more life insurance policies covering one individual regardless of who owns the

14

policies or the number of beneficiaries.[52]

60.    Defendant had the ability and obligation to prevent such enormous financial injury. Defendant could and should have spared Plaintiffs and Class Members from the anxiety, fear, and uncertainty now facing Plaintiffs, Class Members, their families, and their estates.

61.    Had Plaintiffs and Class Members been notified of Phoenix/PHL Variable's financial condition prior to 2024, they could have exchanged their Phoenix life insurance and annuity products for more suitable products.

62.    Specifically, Plaintiffs and Class Members could have performed an exchange of insurance policies under 26 U.S.C. § 1035 (a "1035 Exchange").

63.    A 1035 Exchange allows policyholders to transfer funds from a life insurance policy, endowment, or annuity to a policy of a similar type. *See* 26 U.S.C. § 1035. The benefit of filing a 1035 Exchange request is that it allows the policyholder to transfer the funds without recognizing any gain or loss.

64.    Additionally, had Plaintiffs and Class Members been notified of Phoenix/PHL Variable's financial troubles and downgrading to a speculative grade rating prior to 2024, Plaintiffs and Class Members could have simply surrendered their policies and purchased other suitable, less risky insurance products.[53]

65.    In February of 2024, State Farm Senior Vice President, Financial Services, Joe

---

[52] https://portal.ct.gov/cid/-/media/cid/1_legal/phl-moratoriumorder.pdf.

[53] "One of the most attractive reasons to purchase **permanent life insurance**, aside from the death benefit protection, is that it **can also be a wealth-building asset**. … Cash surrender value is the actual amount of money you will receive if you choose to terminate a permanent life insurance policy before its maturity date, or before you die." https://www.guardianlife.com/life-insurance/surrender (emphasis added).

Monk, boasted that State Farm agents have "**needs-based conversations** ... with customers **every day** in communities **across the country.**"[54]

66.     In each of its press releases, State Farm emphasizes that, "[f]or over 100 years, the mission of State Farm has been to **help people manage the risks of everyday life**, recover from the unexpected and realize their dreams."[55]

67.     Defendant has failed Plaintiffs and Class members in all of these regards, and has abused its position of trust.

## E.     Experiences of Plaintiffs

### a.  Plaintiff Gordon Jason

68.     Plaintiff Gordon Jason was induced and targeted by a State Farm agent to acquire a Phoenix Variable Universal Life policy in February of 2006 (the "Phoenix VUL Policy").

69.     Plaintiff Jason is the trustee of the Gordon F. Jason Trust dated December 8, 2010 (the "Trust") that Plaintiff Jason created as grantor for the benefit of his wife Margaret A. Jason. The VUL Policy is owned by Plaintiff Jason and the Trust is the named beneficiary of the VUL Policy.

70.     Plaintiff Jason has been a loyal State Farm customer since 1992 and currently maintains seven (7) State Farm policies, not including the Phoenix VUL Policy.

71.     Plaintiff Jason maintained a relationship with a State Farm agent, Mr. Thomas Centeno ("Agent Centeno") from approximately 1996 until 2010. After 2010, Plaintiff Jason changed his insurance advisor to another State Farm agent by the name of Mr. Tim Curry.

---

[54] https://newsroom.statefarm.com/pacific-life-alliance/.

[55] *Id.*

72.     Agent Centeno recommended that Plaintiff Jason purchase the Phoenix VUL policy in 2006 when Jason asked Agent Centeno to increase his State Farm VUL policy from $500,000 to $1,000,000 in coverage to protect his wife and ensure that she would be taken care of in the event of his premature death. Agent Centeno told Plaintiff Jason that State Farm no longer issued VUL policies and that the Phoenix VUL policy was the equivalent of his previously issued State Farm Management Corp. $500,000 VUL and suitable for Plaintiff Jason's estate planning needs.

73.     Agent Centeno discouraged Plaintiff Jason from going to New York Life Insurance Company for VUL coverage, falsely claiming that Plaintiff Jason's Phoenix VUL policy was the equivalent of his previously issued State Farm VUL Policy.

74.     At no point did Agent Centeno or any State Farm representative inform Plaintiff Jason about the extent of Phoenix's financial difficulties.

75.     At no point did Agent Centeno or any State Farm representative inform Plaintiff Jason that State Farm stopped selling Phoenix products and services in March 2009.

76.     At no point did Agent Centeno or any other State Farm representative inform Plaintiff Jason of Agent Centeno's commission arrangement for the sale of the Phoenix VUL Policy.

77.     Plaintiff Jason did not learn about the scope and magnitude of Phoenix's deteriorating financial condition until he received a letter from the State of Connecticut Department of Insurance in June of 2024, informing Plaintiff Jason of Rehabilitation Proceedings and the Moratorium Order that restricts withdrawals from his Phoenix VUL Policy and limits death benefit payouts to the Moratorium Cap limit of $300,000.

17

78.     Plaintiff Jason believed that his relationship with State Farm was one built on trust and confidence over three decades, and that he was deceived, betrayed and abandoned by State Farm.

79.     Plaintiff Jason faces constant anxiety, fear and uncertainty over his estate legacy, and his ability to provide for his wife when he passes.

### b. Plaintiff Jennifer Nappo

80.     Plaintiff Nappo was solicited, induced, and/or targeted by a State Farm agent to acquire a Phoenix term life insurance policy.

81.     Plaintiff Nappo has been a loyal State Farm customer since 2007. Plaintiff Nappo maintained a relationship with a State Farm agent, Mr. James Flynn ("Agent Flynn"), from in or around 2007 until 2024.

82.     In or around November 2007, Plaintiff Jennifer Nappo and her late husband, James Nappo, purchased a $2,000,000 Phoenix term life insurance policy (the "Term Life Policy") insuring the life of James.

83.     The Term Life Policy was recommended to Plaintiff Nappo by their trusted State Farm agent, Agent Flynn. The life insurance policy was purchased as a part of the Nappo family's financial plan to make sure that Plaintiff Nappo and her two children would be taken care of, in the event that her husband died prematurely.

84.     Plaintiff Nappo trusted Agent Flynn; over the years, Plaintiff Nappo had purchased life insurance, disability insurance, rental insurance, fire insurance, and car insurance from Agent Flynn.

85.     James Nappo died tragically in April 2024 after a difficult twenty three month battle with glioblastoma, a malignant brain tumor.

86.     Agent Flynn knew about Phoenix/PHL Variable's financial troubles since at least 2009. Despite Agent Flynn having known about Phoenix/PHL Variable's financial troubles, Agent Flynn never said anything to Plaintiff or the Nappo's about the risks associated with Phoenix/PHL Variable.

87.     At no point did Agent Flynn inform Plaintiff Nappo that Phoenix had been downgraded.  Nor was Plaintiff Nappo aware that Phoenix had been downgraded.

88.     At no point did Agent Flynn inform Plaintiff Nappo that State Farm stopped selling Phoenix Products and services. Nor was Plaintiff Nappo aware that State Farm stopped selling Phoenix Products and services.

89.     At no point did Agent Flynn inform Plaintiff Nappo of Agent Flynn's commission arrangement for the sale of the $2,000,000 term life insurance policy. Nor was Plaintiff Nappo aware that State Farm agents had a commission arrangement for the sale of Phoenix products and services like the Term Life Policy.

90.     Plaintiff Nappo did not learn about the scope and magnitude of PHL Variable's financial condition until after her late husband passed. Only then was she was made aware of PHL Variable's Rehabilitation Proceedings and the Moratorium Order that limits death benefit payouts to the Moratorium Cap limit of $300,000.

91.     Plaintiff Nappo's Hardship application was denied by the Rehabilitator.

92.     Plaintiff Nappo's claim for additional funds made to the California Life and Health Guaranty Association was also denied.

93.     Plaintiff Nappo faces fear and uncertainty as a mother of two who has been out of the work force for more than two decades.

94.     Plaintiff Nappo believed that her relationship with State Farm was one built on trust

and confidence over decades. She feels betrayed by State Farm and Agent Flynn, who let her and her family down.

### c. Plaintiff Patrick McLaughlin

95.    Plaintiff Patrick Mclaughlin was solicited, induced, and/or targeted by a State Farm agent to acquire a Variable Universal Life second to die survivorship policy insuring the lives of Lori Mclaughlin and Patrick Mclaughlin (the "VUL Policy") with a base face amount of $1,500,000.

96.    Plaintiff McLaughlin has been a loyal State Farm customer since in or around the mid-1980s. Plaintiff Mclaughlin has maintained a relationship with a State Farm agent, Mr. Harlan Parker ("Agent Parker"), since the mid-1980s.

97.    Agent Parker sold numerous insurance policies to the McLaughlin family dating back to the mid-1980's, including rental insurance, homeowners' insurance, ATV insurance, boat insurance, auto insurance, equipment insurance, an umbrella insurance policy, and life insurance.

98.    At all times, Parker held himself out as someone that Plaintiff McLaughlin and his family could trust.

99.    Shortly after the birth of his daughter, Plaintiff McLaughlin asked Agent Parker if he knew any estate planning attorneys in town and Agent Parker referred him to an estate planning attorney by the name of J. Joseph Morris ("Attorney Morris").

100.    Attorney Morris prepared a Last Will and Testament for Patrick and Lori McLaughlin in 1995.

101.    Attorney Morris also prepared a trust for the McLaughlin family in 2003.

102.    Agent Parker solicited Plaintiff Mclaughlin to attend a seminar about life insurance and estate planning, which was hosted by Agent Parker's State Farm agency in Olathe, Kansas

20

(the "Dog and Pony show"). Agent Parker gave a presentation about life insurance and estate planning at the Dog and Pony show, as did Attorney Morris.

103.    Shortly after attending the Dog and Pony show, Plaintiff McLaughlin and Lori McLaughlin went to Attorney Morris' office and a junior attorney in Morris' office prepared a second to die trust for purposes of holding the Phoenix VUL Policy recommended by Parker.

104.    Agent Parker made numerous representations to the Mclaughlin's about the suitability of the VUL Policy for the McLaughlin's estate planning needs. Agent Parker told Plaintiff McLaughlin that the Phoenix VUL Policy was a safe and secure estate planning investment that would protect Plaintiff Mclaughlin's children from estate taxes in the event of Plaintiff McLaughlin's or Plaintiff's wife's premature deaths.

105.    Agent Parker and Attorney Morris both advised Plaintiff McLaughlin to create a specific second to die irrevocable life insurance trust ("ILIT") to hold the VUL Policy as its sole asset for estate and financial planning purposes.

106.    At no point did Agent Parker inform Plaintiff McLaughlin that Phoenix had been downgraded. Nor was Plaintiff McLaughlin aware that Phoenix had been downgraded.

107.    At no point did Agent Parker inform Plaintiff McLaughlin that State Farm stopped selling Phoenix Products and services. Nor was Plaintiff McLaughlin aware that State Farm stopped selling Phoenix Products.

108.    At no point did Agent Parker inform Plaintiff McLaughlin of Agent Parker's commission arrangement for the sale of the Phoenix VUL Policy. Nor was Plaintiff McLaughlin aware that State Farm agents had a commission arrangement for the sale of Phoenix Products like his VUL Policy.

109.    Despite Agent Parker having known about Phoenix/PHL Variable's financial troubles at least as early as 2009, Agent Parker never said anything to Plaintiff or the McLaughlin's about the risks associated with Phoenix/PHL Variable.

110.    Upon information and belief, Agent Parker actively concealed Phoenix's financial troubles from Plaintiff McLaughlin and others who invested in Phoenix life insurance and annuity products marketed by State Farm, its agents, subsidiaries and affiliates.

111.    Plaintiff McLaughlin did not learn about the scope and magnitude of PHL Variable's financial condition until in or around late May 2024. Around this time, Plaintiff McLaughlin was first made aware of PHL Variable's Rehabilitation Proceedings and the Moratorium Order that limits death benefit payouts to the Moratorium Cap limit of $300,000, or, **$1,200,000 less than the death benefits contemplated by Plaintiff McLaughlin's VUL Policy**.

112.    Agent Parker told Patrick McLaughlin that State Farm corporate directed Agent Parker to not discuss anything about PHL in detail.

113.    Agent Parker knew that thousands of captive State Farm agents recommended Phoenix annuities and life insurance to their high-net-worth customers. Agent Parker also knew that State Farm agents earned millions in upfront commissions and trailer commissions by selling unsuitable annuity contracts and life insurance policies to their trusting customers, putting their own economic interests in front of the financial interests of their customers.

114.    Plaintiff McLaughlin believed that his relationship with State Farm was one built on trust and confidence over decades, and he feels betrayed by State Farm.

115.    Plaintiff McLaughlin faces fear and uncertainty over his estate legacy, and he has no idea how the PHL Variable Rehabilitation will impact his Phoenix VUL Policy and his ability to provide for his family when he passes.

22

## CLASS ACTION ALLEGATIONS

116.     Plaintiffs bring this action individually and as representatives of all those similarly situated, pursuant to Federal Rule of Civil Procedure 23, on behalf of the below-defined Classes:

> (a)     Plaintiffs seek to represent a class defined as all persons in the United States who were solicited, induced, and/or targeted by State Farm agents to purchase life insurance policies or annuity contracts offered by The Phoenix Companies, Inc. (the "Phoenix products"), and did purchase the Phoenix products (the "Class").

> (b)     Plaintiff Jason also seeks to represent a subclass of all Class Members who were solicited, induced, and/or targeted by State Farm agents to purchase the Phoenix products, and did purchase the Phoenix products, in Illinois (the "Illinois Subclass").

> (c)     Plaintiff Nappo also seeks represent a subclass of all Class Members who were solicited, induced, and/or targeted by State Farm agents to purchase the Phoenix products, and did purchase the Phoenix products, in California (the "California Subclass").

117.     The Class and Subclasses are collectively referred to as the "Classes."

118.     Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Classes may be expanded or narrowed by amendment to the complaint or narrowed at class certification.

119.     Specifically excluded from the Classes are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

120.     **Numerosity**: The members of the Classes are so numerous that joinder of all members is impractical, which, upon information and belief, number in the thousands. In 2007

alone, Defendant accounted for 15% of Phoenix's total life premiums and 62% of its annuity deposits. Defendant was Phoenix's largest distributor of life insurance.

121. **Commonality**:  There are questions of law and fact common to the Classes because Class Members' claims are identical to one another and predicated on the common contention that they were injured by having been solicited, induced, and/or targeted by State Farm agents to purchase and actually did life insurance policies or annuity contracts offered by The Phoenix Companies, Inc., and Defendant violated its fiduciary and professional duties, violations of state consumer protection laws, and breach of the covenant of good faith and fair dealing, with respect to those products. Proceeding as a class action will generate answers to common questions that are apt to drive resolution of the litigation. Such common questions include, but are not limited to:

(a) Whether State Farm breach its fiduciary duties by failing to properly notify Plaintiffs and Class Members;

(b) Whether State Farm engaged in unfair and deceptive conduct by misrepresenting, concealing, suppressing, or omitting that Phoenix's financial condition was threatened;

(c) Whether State Farm abused its position of superior knowledge and sophistication to collect compensation in connection with the Phoenix products;

(d) The proper form of equitable relief;

(e) The proper measure of monetary relief.

122. **Typicality**: The named Plaintiffs' claims are typical of the Class's claims. The named Plaintiffs' claims arise from the same conduct, and seek to redress the same legal violations, as the Class's claims.

123. **Adequacy**: The named Plaintiffs will fairly and adequately protect the interests of the Class. The named Plaintiffs have no interest antagonistic to those of the other Class Members.

The named Plaintiffs are committed to the vigorous prosecution of this action. They have retained counsel who are experienced and competent in the prosecution of large class actions.

124. **Rule 23(b)(1)**: The prerequisites for a (b)(1) class are satisfied. Prosecution of separate actions by Class Members would risk establishing incompatible standards of conduct for Defendant. Additionally, adjudications as to individual Class Members would, as a practical matter, dispose of the interests of other members of the Class and substantially impair their ability to protect their interests.

125. **Rule 23(b)(3)**: The prerequisites for a Rule 23(b)(3) class are satisfied because common questions of law and fact predominate and are susceptible to class-wide proof. Classwide litigation of this action is also superior to individual litigation because there are no difficulties in managing this case as a class action and there is a strong need to concentrate the Class Members' claims in one action.

## CAUSES OF ACTION
### COUNT I
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiffs and the Nationwide Class)**

126. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

127. Defendant, acting in its various positions including but not limited to expert, advisor, planner, agent, dual agent, and broker, owed Plaintiffs a fiduciary duty by virtue of the special trust and confidence placed in it by Plaintiffs.

128. Plaintiffs placed trust and confidence and otherwise depended on Defendant to perform its obligations to Plaintiffs in its various positions. Defendant's obligations are significantly enhanced because, *inter alia*, Defendant holds worldwide recognition as a leading

insurance professional and is the largest casualty insurance provider in the United States; Defendant held itself out as a professional with respect to the Phoenix products and services, which were the only third-party life and annuity products and services sold by Defendant at that time; Defendant targeted Plaintiffs and Class Members as "affluent high-net-worth customers" with respect to the Phoenix products; Defendant marketed Phoenix products to Plaintiffs and Class Members for their estate planning needs.

129.     In Illinois, an insurance producer must not "us[e] fraudulent, coercive, or dishonest practices, or demonstrate[e] incompetence, untrustworthiness or financial irresponsibility in the conduct of business in this State or elsewhere." 215 ILCS § 5/500-70.

130.     Defendant's conduct, as alleged above, failed to meet the heightened standards of trust, competence, and care owed in a fiduciary relationship.

131.     Defendant breached its fiduciary duties by failing to notify Plaintiffs and Class Members of (1) Phoenix's downgrade; (2) Defendant's decision to stop selling Phoenix life insurance and annuity products; and (3) that Plaintiffs and Class Members' policies and contracts may be threatened due to Phoenix/PHL's poor and deteriorating financial condition.

132.     Defendant further breached its fiduciary duties by misappropriating premiums and placing them with Phoenix/PHL when the placement was not in the best interest of Plaintiffs and Class Members.

133.     Defendant had a fiduciary duty to protect Plaintiffs and a fiduciary duty to advise Plaintiffs or take other action upon gaining information that Plaintiffs' policies and contracts may be threatened due to Phoenix/PHL's poor, deteriorating, and unsound financial condition.

134.     However, Defendant failed to do so. Instead, Defendant explicitly advised its agents not to discuss the stability of Phoenix/PHL.

26

135.    Had Plaintiffs and Class Members been made aware of the true nature of the Phoenix Products or Phoenix/PHL Variable's unsound financial condition, Plaintiffs and Class Members (1) would have stopped paying premiums on their Phoenix products; and (2) would have exchanged or surrendered their Phoenix products for that of a suitable alternative.

136.    Defendant's breaches of its fiduciary duties have resulted in significant losses to Plaintiffs and Class Members.  These losses are continuing and increasing.

137.    As a direct and proximate result of Defendant's breaches of its fiduciary duties to Plaintiffs, Plaintiffs have been damaged in an amount in accordance with proof at trial.

**COUNT II**
**Professional Negligence**
**(On Behalf of Plaintiffs and the Nationwide Class)**

138.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

139.    Defendant assumed a fiduciary role to Plaintiffs and Class Members in connection with the Agreement and the Phoenix life insurance policies and annuity contracts.

140.    Defendant's professional relationship with Plaintiffs and Class Members was not a one-off, transactional relationship; instead, Defendant maintained a long-time, trusting relationship with Plaintiffs and Class Members.

141.    Defendant owes at least the ordinary duty of care that every person owes to prevent harm where that person's actions have created a foreseeable risk of injury. Defendant also owed a heightened duty of care. Plaintiffs were owed a duty of care and were harmed by Defendant's acts and omissions.

142.    Defendant failed to notify Plaintiffs and Class Members with respect to (1) Phoenix's downgrade; (2) Defendant's decision to stop selling Phoenix life insurance and annuity

27

products; and (3) that Plaintiffs and Class Members' policies and contracts may be threatened due to Phoenix/PHL's poor, deteriorating, and unsound financial condition.

143.    Defendant continued to collect significant compensation in connection with Plaintiffs and Class Members' Phoenix Products following Phoenix's downgrade and with full knowledge that Phoenix/PHL's financial outlook was poor, deteriorating, and unsound.

144.    Defendant continued to collect millions of dollars in compensation in connection with Plaintiffs and Class Members' Phoenix Products, while knowing that Phoenix/PHL had a reduced ability to borrow and that declines in Phoenix/PHL's ratings would likely materially and adversely affect Phoenix/PHL's financials.

145.    Defendant should have advised or notified Plaintiffs and Class Members that their policies and contracts may be threatened due to Phoenix/PHL's unsound financial condition.  This is especially true given that Defendant stopped selling Phoenix Products through its own distribution system shortly after learning of Phoenix's having been downgraded.

146.    Among other things, Defendant knew for approximately fifteen (15) years prior to PHL's rehabilitation that Phoenix was downgraded to speculative grade, and that Plaintiffs had legally protected interests in the Phoenix Products that Defendant continued to collect compensation in connection therewith. Defendant's spokesman conceded that the Phoenix financial strength downgrades by rating agencies was the reason that Defendant stopped selling Phoenix Products.

147.    Defendant would have also known that PHL Variable was placed under an order of administrative supervision in spring of 2023, shortly before the May 2024 PHL Rehabilitation.

148.    Defendant therefore knew, or reasonably should have known, that failing to notify or advise Plaintiffs and Class Members of changes in Phoenix's financial condition could harm

Plaintiffs and Class Members.

149.     Had Plaintiffs and Class Members been made aware of the true nature of the Phoenix products or Phoenix/PHL Variable's unsound financial condition, Plaintiffs and Class Members (1) would have stopped paying premiums on their Phoenix Products; and (2) would have exchanged or surrendered their Phoenix products for that of a suitable alternative.

150.     As a direct and proximate result of Defendant's negligence and resulting breach of its duty of professional care, Plaintiffs have been damaged in an amount in accordance with proof at trial.

### COUNT III
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS 505/1, *et seq*.**
**(On Behalf of Plaintiff Gordon Jason and the Illinois Subclass)**

151.     Plaintiff Gordon Jason repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Illinois Subclass.

152.     Plaintiff Jason and other Illinois Subclass Members are persons within the context of the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), 815 ILCS 505/1(c).

153.     Defendant is a person within the context of the ICFA, 815 ILCS 505/1(c).

154.     At all times relevant hereto, Defendant was engaged in trade or commerce as defined under the ICFA, 815 ILCS 505/1(f).

155.     Plaintiff Jason and the proposed Illinois Subclass are "consumers" who purchased the Products for personal, family or household use within the meaning of the ICFA, 815 ILCS 505/1(e).

156.    The ICFA prohibits engaging in any "unfair or deceptive acts or practices … in the conduct of any trade or commerce."  ICFA, 815 ILCS 505/2.

157.    The ICFA prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices including using deception, fraud, false pretenses, false promises, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or employment of any practice described in Section 2 of the Uniform Deceptive Trade Practices Act ("UDTPA").  815 ILCS § 505/2.

158.    Defendant's conduct in misrepresenting, concealing, suppressing, or omitting materials facts in connection with the PHL products and/or services is a violation of Section 2 of the IFCA.

159.    Defendant's conduct, as described herein, took place within the State of Illinois and constitutes unfair or deceptive acts or practices in the course of trade and commerce, in violation of 815 ICFA 505/1, *et seq*.

160.    Defendant intended that Plaintiff Jason and each of the other Illinois Subclass Members would reasonably rely upon the misrepresentations, concealment, omissions, and other deceptive conduct concerning the Phoenix products.

161.    Given that (1) Defendant holds worldwide recognition as a leading insurance professional; (2) Defendant is the largest casualty insurance provider in the United States, and (3) Defendant held itself out as a professional with respect to the Phoenix life insurance and annuity products, which were the only third-party life and annuity products sold by Defendant at that time, Plaintiffs and reasonable consumers trusted and relied on Defendant's representations and omissions regarding the Phoenix products.

162.    Defendant's misrepresentations, concealment, omissions, and other deceptive

30

conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiff Jason and each of the other Illinois Subclass Members to be deceived about the true nature of the Phoenix Products.

163.    Plaintiff Jason and Illinois Subclass Members have been damaged as a proximate result of Defendant's unfair and deceptive violations of the ICFA and have suffered damages as a direct and proximate result of purchasing the Products and paying premiums on these products.

164.    Defendant's misconduct was outrageous and its violative acts were performed with malice, evil motive, or reckless indifference toward the rights of Plaintiff and Class Members. Had Defendant not concealed material information from Plaintiffs and Class Members, Plaintiffs and Class Members would have been able to take retirement security into their own hands.

165.    As a direct and proximate result of Defendant's violations of the ICFA, as set forth above, Plaintiff Jason and the Illinois Subclass Members have suffered ascertainable losses of money caused by Defendant's misrepresentations, concealment, omissions, and other deceptive conduct with respect to the Phoenix products.

166.    Had they been aware of the true nature of the Phoenix products, Plaintiff Jason and the Illinois Subclass Members would have stopped paying premiums on their Phoenix products.

167.    Had they been aware of the true nature of the Phoenix products, Plaintiff Jason and the Illinois Subclass Members would have exchanged or surrendered their Phoenix products for that of a suitable alternative.

168.    Based on Defendant's unfair and/or deceptive acts or practices, Plaintiff Jason and the Illinois Subclass Members are therefore entitled to relief, including restitution, actual damages, punitive damages, costs, and attorneys' fees, under 815 ILCS 505/10a. *See* 815 ILCS 505/10a(a) ("Any person who suffers actual damage as a result of a violation of this Act committed by any

other person may bring an action against such person. The court, in its discretion may award *actual economic damages or any other relief* which the court deems proper...") (emphasis added).

## COUNT IV
### Violation of the California's Unfair Competition Law
### *Bus. & Prof. Code § 17200 et seq.*
### (On Behalf of Plaintiff Nappo and the California Subclass)

169.     Plaintiff Nappo repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed California Subclass.

170.     California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* (the "UCL"), prohibits "unlawful, unfair, or fraudulent business act or practices" and "unfair, deceptive, untrue or misleading advertising."

171.     Defendant regularly transacts business in California and has engaged in misconduct that has had a direct, substantial, foreseeable, and intended effect of injuring people in California.

172.     Defendant violated the UCL by engaging in unlawful, unfair, and deceptive business acts and practices as described herein.

173.     Defendant chose to withhold material facts from Plaintiff Nappo and California Subclass members regarding Phoenix's downgrade; Defendant's decision to stop selling Phoenix Products and/or services; and that Plaintiff and Class Members' coverage may be threatened due to Phoenix/PHL's poor and deteriorating financial condition.

174.     Had they been aware of any of these facts or the true nature of their Phoenix Products, Plaintiff Nappo and the California Subclass Members would have immediately stopped paying premiums on their Phoenix products.

175.    Had they been aware of any of these facts or true nature of the Phoenix products, Plaintiff Nappo and the California Subclass Members would have immediately exchanged or surrendered their Phoenix Products for that of a suitable alternative.

176.    Defendant's acts and omissions were likely to deceive reasonable consumers and the public.  Reasonable consumers expect to be told about threats facing their Phoenix Products of which Defendant had knowledge. Indeed, Defendant itself stopped selling Phoenix Products after learning about the Phoenix financial strength downgrades by rating agencies.

177.    Reasonable consumers also expect that the insurance products and services for which they continuously and regularly pay premiums are not subject to looming and imminent financial threat, unless told otherwise. This is especially true given that Defendant holds worldwide recognition as a leading insurance professional, Defendant is the largest casualty insurance provider in the United States, and because Defendant held itself out as a professional with respect to the Phoenix life insurance and annuity products, which were the only third-party life and annuity products and services sold by Defendant at that time.

178.    Consumers like Plaintiff Nappo and the California Subclass Members could not have reasonably avoided economic injury because Defendant's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers, Defendant created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

179.    Defendant engaged in these deceptive practices for significant financial gain, which is unfair, unreasonably dangerous to Plaintiff Nappo and the California Subclass members, and not outweighed by any benefit. Omitting and concealing material financial risk facing Plaintiff and

33

California Subclass Members' life insurance and annuity products is unethical, unscrupulous, and offensive. Insurance policies and annuity contracts are designed to provide for consumers like Plaintiff Nappo when they are at their most vulnerable both personally and financially.

180.     Plaintiff Nappo and California Subclass members have expended money due to Defendant's acts and have lost money and property due to Defendant's acts.

181.     Plaintiffs and California Subclass members' economic injuries were the result of the unfair business practices that are the gravamen of their action.

182.     As a result of such unfair business practices and pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff Nappo, on behalf of herself and the California Subclass, seek an order requiring Defendant to (a) provide restitution; and (b) disgorge all revenues, earnings, profits, compensation, and other benefits obtained by Defendant as a result of its unfair business practices in violation of the UCL. Plaintiff Nappo and the California Subclass seek all other relief allowable under the UCL.

183.     Plaintiff Nappo and the California Subclass also seek attorneys' fees pursuant to California Code of Civil Procedure § 1021.5 ("a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if" under certain circumstances).

**COUNT V**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Nationwide Class)**

184.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

185.    Defendant received benefits from Plaintiffs and Class Members and unjustly retained those benefits at their expense.  For example, Plaintiffs and the Class Members paid premiums for the Phoenix Products that earned Defendant millions of dollars in compensation.

186.    Said compensation was conferred on Defendant by Plaintiffs and Class Members under a mistake of fact due to Defendant's misrepresentations and/or omissions, and unlawfully obtained to the detriment of Plaintiffs and the Class Members.

187.    Defendant has been unjustly enriched in that it received and retained the benefit of funds to which it was not entitled and received in violation of its fiduciary and professional duties, and also in violation of state consumer protection laws.

188.    Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct harmed Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

189.    Allowing Defendant to retain the aforementioned benefits violates fundamental principles of justice, equity, and good conscience. As a sophisticated insurance company that had actual knowledge of Phoenix's poor, deteriorating, and unsound financial condition, Defendant was well aware that its conduct violated its duties to Plaintiffs and Class Members and exposed them to tremendous financial risk.

190.    Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and Subclass members is unjust and inequitable, Defendant must pay restitution to Plaintiff and the Subclass members for its unjust enrichment.

191.    Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds it received, and such other relief as the Court may deem just and proper.

## COUNT VI
### Breach of the Covenant Of Good Faith And Fair Dealing
### (On Behalf of Plaintiffs and the Nationwide Class)

192. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

193. Plaintiffs and Class Members contracted with Defendant for professional expertise, advising, planning, and services regarding the Phoenix life insurance and annuity products.

194. State Farm agents got paid commissions for recommending that their high-net-worth clients purchase Phoenix life insurance policies and annuity contracts. Those commissions were paid upfront and overtime in the form of trailer commissions.

195. Every contract carries with it an implied covenant of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. The covenant requires faithfulness to an agreed common purpose and consistency with the justified expectations of the other party to a contract.

196. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

197. Even though State Farm agents knew about Phoenix's financial troubles, State Farm agents were directed to not share—and did not share—that critical information with their customers, including Plaintiffs and Class Members.

198. Instead, State Farm and its agents allowed Plaintiffs and Class Members to continue paying millions of dollars of funds into an insurance company that was doomed to fail and did, in

fact, fail.

199.    Defendant has breached the covenant of good faith and fair dealing in the contract through its policies and practices as to Phoenix life insurance and annuity products as alleged herein.

200.    For example, Defendant harmed consumers by failing to notify Plaintiffs and Class Members of (1) Phoenix's downgrade; (2) Defendant's decision to stop selling Phoenix products; and (3) that Plaintiff and Class Members' policies and contracts were threatened due to Phoenix/PHL's poor and deteriorating financial condition.

201.    Defendant abused its position of superior knowledge and sophistication to collect commissions and compensation in connection with Plaintiffs' and Class Members' life insurance and annuity products.

202.    Plaintiffs and Class Members have sustained damages as a result of Defendant's breaches of the covenant of good faith and fair dealing.

49.    Plaintiffs and Class Members are thus entitled to relief in the form of damages, restitution, injunctive and other appropriate equitable relief.

## <u>PRAYER FOR RELIEF</u>

Plaintiffs, on behalf of themselves and all others similarly situated, seek judgment against Defendant, as follows:

(a)    For an order certifying the Class and Subclasses (the "Classes") under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as representatives of the Classes, and naming Plaintiffs' attorneys as Class Counsel to represent the Classes;

(b)    For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

37

(c)     For actual damages Plaintiffs and Class Members suffered, as measured by the difference in value of their policies and contracts at the time of purchase and the value of their policies and contracts as of the present;

(d)     For equitable relief, including the imposition of a constructive trust or other equitable remedies such as restitution, an accounting, or disgorgement of ill-gotten gains;

(e)     For statutory damages in amounts to be determined by the Court and/or jury;

(f)     For prejudgment interest on all amounts awarded;

(g)     For an order awarding reasonable attorneys' fees and expenses and costs of suit; and

(h)     Grant any other relief as the Court deems appropriate to remedy the violations.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury for all the claims asserted in this Complaint so triable.

Date: November 26, 2025                    Respectfully submitted,

By: */s/ Yitzchak Kopel*
        Yitzchak Kopel

**BURSOR & FISHER, P.A.**
Yitzchak Kopel
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: ykopel@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (IL Bar No. 6337165)
50 Main St., Ste. 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656

E-mail: pfraietta@bursor.com

**EDWARD STONE LAW P.C.**
Edward S. Stone*
205 East 42nd Street, Suite 1900
New York, NY 10017
Telephone: (203) 504-8425
Facsimile: (203) 348-8477
E-Mail: eddie@edwardstonelaw.com

*Attorneys for Plaintiffs*

*\*Pro Hac Vice application forthcoming*