**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| GORDON JASON, JENNIFER NAPPO, PATRICK MCLAUGHLIN, MELISSA MURREN, AMY HANSEN, JUDITH GREENLAW, WILLIAM JACOBSON, KAREN JACOBSON, REBECCA BALDWIN JOHNSON, LINDA ROWE, ANGELA FUREY, DENISE WERNER, GREGORY WRIGHT, and BILLY SISCO, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, and Unnamed Affiliates & Associates 1-100,<br><br>Defendants. | Case No. 1:25-cv-14507<br><br>Hon. Virginia M. Kendall<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED CLASS ACTION COMPLAINT

1. Plaintiffs Gordon Jason, Jennifer Nappo, Patrick McLaughlin, Melissa Murren, Amy Hansen, Judith Greenlaw, William Jacobson, Karen Jacobson, Rebecca Baldwin Johnson, Linda Rowe, Angela Furey, Denise Werner, Gregory Wright, and Billy Sisco ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against State Farm Mutual Automobile Insurance Company, and Unnamed Affiliates 1-100 (collectively, "State Farm" or "Defendant") for breach of fiduciary duty, professional negligence, violation of state consumer fraud acts, unjust enrichment, and breach of the covenant of good faith and fair dealing, with respect to life insurance policies and annuity contracts sold by State Farm agents pursuant to an agreement with PHL Variable Insurance Co. f/k/a The Phoenix Companies, Inc. ("Phoenix" or "PHL Variable"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on their personal knowledge.

## NATURE OF THE ACTION

2. This is a class action on behalf of all persons in the United States who acquired rights under life insurance policies or annuity contracts offered by The Phoenix Companies, Inc. (the "Phoenix Products") sold by Defendant, or purchased the Phoenix Products from State Farm through State Farm agents.[1]

3. Defendant State Farm occupied and assumed a unique position of trust and confidence with Plaintiffs and Class Members concerning their Phoenix Products, including those related to estate planning. Defendant targeted Plaintiffs and Class Members in connection with

[1] Phoenix Products were subsequently transferred to PHL Variable Insurance Company through a series of restructuring transactions.

these Phoenix Products and represented the Products as safe and secure investments.

4. Defendant abused its position of trust. For more than a decade, Defendant concealed real and imminent threats facing Plaintiffs' and Class Members' policies and contracts and associated benefits. Defendant knew the financial risk facing Phoenix and chose to keep silent so it could quietly pocket millions of dollars in compensation, to the detriment of Plaintiffs and Class Members.

5. Plaintiffs and Class Members—many of which having maintained a relationship with State Farm and its agents for decades—were wholly unaware of these threats to their life insurance policies and annuity contracts. Nor would Plaintiffs and Class Members have reason to believe that Defendant, as the nation's largest casualty insurance provider, would choose to leave them in the dark.

6. By the time Plaintiffs and Class Members became aware of their financial injury, it was too late. Defendant failed to warn and concealed material facts from Plaintiffs and Class Members. Today, PHL Variable Insurance Company ("PHL Variable") is in rehabilitation, and Plaintiffs and Class Members are unable to receive the full benefits due under their policies and contracts. Neither can they exchange or surrender their Phoenix Products for a suitable alternative.

7. Despite paying hundreds of millions of dollars in premiums over the course of a decade, Plaintiffs and Class Members are left holding the bag, while Defendant profited handsomely as a result of its deceptive and violative conduct as detailed herein.

## JURISDICTION AND VENUE

8. This Court has federal subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class

member is a citizen of a state different from Defendant.

9. This Court has personal jurisdiction over Defendant because it maintains its principal place of business in Illinois.

10. Venue is proper in this District because a substantial part of the events or omissions giving rise to Plaintiff Gordon Jason's claims occurred in this District and Plaintiff Jason resides in this District.

## THE PARTIES

11. Plaintiff Gordon Jason is an adult citizen and resident of the State of Illinois and is domiciled in Elmhurst, Illinois.

12. Plaintiff Jennifer Nappo is an adult citizen and resident of the State of California and is domiciled in Mountain View, California.

13. Plaintiff Patrick McLaughlin is an adult citizen and resident of the State of Missouri and is domiciled in Dawn, Missouri.

14. Plaintiff Melissa Murren is an adult citizen and resident of the State of South Carolina and is domiciled in Murrells Inlet, South Carolina.

15. Plaintiff Amy Hansen is an adult citizen and resident of the State of Virginia and is domiciled in Oak Hill, Virgina.

16. Plaintiff Judith Greenlaw is an adult citizen and resident of the State of Maine and is domiciled in Deer Isle, Maine.

17. Plaintiff William Jacobson is an adult citizen and resident of the State of Texas and is domiciled in Spring, Texas.

18. Plaintiff Karen Jacobson is an adult citizen and resident of the State of Texas and is domiciled in Spring, Texas.

19. Plaintiff Rebecca Baldwin Johnson is an adult citizen and resident of the State of South Carolina and is domiciled in Greer, South Carolina.

20. Plaintiff Linda Rowe is an adult citizen and resident of the State of New Jersey and is domiciled in Saddle River, New Jersey.

21. Plaintiff Angela Furey is an adult citizen and resident of the State of California and is domiciled in Huntington Beach, California.

22. Plaintiff Denise Werner is an adult citizen and resident of the State of Illinois and is domiciled in Illinois.

23. Plaintiff Billy Sisco is an adult citizen and resident of the State of Tennessee and is domiciled in Brighton, Tennessee.

24. Plaintiff Gregory Wright is an adult citizen and resident of the State of California and is domiciled in Alpine, California.

25. Defendant State Farm Mutual Automobile Insurance Company is incorporated in Delaware and has its principal place of business at One State Farm Plaza, Bloomington, Illinois 61710. Defendant is the largest property and casualty insurance provider and the largest auto insurance provider in the United States.

26. Unnamed Affiliates & Associates 1-100 include but are not limited to: any and all affiliates, assignees, subsidiaries, successors and transferees, officers, directors, partners, agents, agencies and employees, and all other persons acting or claiming to act on their behalf or in concert with Defendant, some of which upon discovery will be added to this Complaint.

## FACTUAL ALLEGATIONS

### A. The State Farm and Phoenix Agreement

27. In March 2001, Defendant State Farm entered into an agreement with PHL Variable

Insurance Co., f/k/a The Phoenix Companies, Inc. (the "Agreement").[2]

28. The Agreement allowed The Phoenix Companies, Inc. "to provide various services to State Farm and its subsidiaries and policyholders, including estate, retirement, executive benefits and charitable gift planning. The agreement also offer[ed] [Phoenix] the opportunity to provide to State Farm's affluent customers, through qualified State Farm agents, additional life and annuity products and services not previously available from those agents."[3]

29. Thus, the Agreement enabled State Farm to provide its agents with a more diverse range of life insurance products to sell.

30. The Agreement also gave State Farm a competitive industry advantage.

31. In a Form S-1 filed in May 2001, Phoenix notes that "[i]nsurance companies" like Defendant "have been moving their agents into an advisor/planner role, resulting in a need to provide their agents, particularly their top producers, with a more diverse range of life insurance products to sell. Insurance companies have responded to this need in part by negotiating arrangements with third party providers, including other insurance companies."[4]

32. This Agreement and its offerings were unique for Defendant, especially in 2001. This is evinced by the fact that as late as 2007, Phoenix still said "[w]e are the *only* third-party

---

[2] https://www.sec.gov/Archives/edgar/data/1129633/000095012301501968/y44223a2s-1a.txt ("In addition, in March 2001 we entered into an agreement with a subsidiary of State Farm Mutual Automobile Insurance Company, ...."); *see also* https://www.sec.gov/Archives/edgar/data/1129633/000119312508043638/d10k.htm.

[3] https://www.sec.gov/Archives/edgar/data/1129633/000095012301501968/y44223a2s-1a.txt.

[4] https://www.sec.gov/Archives/edgar/data/1129633/000095012301502973/y44223a3s-1a.txt (emphasis added).

provider of life and annuity products and services at State Farm."[5]

33. The Agreement was profitable for both Defendant and Phoenix. Phoenix explained in 2007 that in approximately six (6) years, "[s]ince [Phoenix's] relationship with State Farm began in mid-2001, it has generated **$290 million** in cumulative new total life premiums and **$1.2 billion** in annuity deposits."[6]

34. Phoenix reported that the following compensation was paid to Defendant[7] from 2002 through 2009:

(a) 2002: $10.7 million[8]

(b) 2003: $25.8 million[9]

(c) 2004: $32.4 million[10]

(d) 2005: $37.6 million[11]

(e) 2006: $50.1 million[12]

(f) 2007: $62.3 million[13]

(g) 2008: $73.9 million[14]

---

[5] https://www.sec.gov/Archives/edgar/data/1129633/000119312508043638/d10k.htm (emphasis added).

[6] https://www.sec.gov/Archives/edgar/data/1129633/000119312508043638/d10k.htm (emphasis added).

[7] Compensation reported as being paid to entities which were "either subsidiaries of State Farm or owned by State Farm employees" or "owned by State Farm agents." *See infra* notes 8-15.

[8] https://www.sec.gov/Archives/edgar/data/1129633/000094937704000135/pnx_64997-10k.htm.

[9] https://www.sec.gov/Archives/edgar/data/1129633/000094937704000135/pnx_64997-10k.htm.

[10] https://www.sec.gov/Archives/edgar/data/1129633/000094937707000109/pnx80444-10k.htm.

[11] https://www.sec.gov/Archives/edgar/data/1129633/000094937707000109/pnx80444-10k.htm.

[12] https://www.sec.gov/Archives/edgar/data/1129633/000094937707000109/pnx80444-10k.htm.

[13] https://www.sec.gov/Archives/edgar/data/1129633/000111650210000184/pnx_10k.pdf.

[14] https://www.sec.gov/Archives/edgar/data/1129633/000111650210000184/pnx_10k.pdf.

(h) 2009: $29.3 million[15]

35. Defendant held in-person seminars for prospective customers like Plaintiffs and Class Members, in which Defendant pitched Phoenix Products for estate planning and had its attorneys present.

36. "During 2008, State Farm was [Phoenix's] largest distributor of annuity and life insurance products accounting for approximately 27% of [Phoenix's] total life insurance premiums and approximately 68% of [Phoenix's] annuity deposits."[16]

37. Defendant chose to extend its profitable venture with Phoenix. In 2007, Phoenix "extended [its] agreement … to provide [] life and annuity products and related services to State Farm's affluent and high-net-worth customers, through qualified State Farm agents **until 2016**."[17]

38. The Phoenix Agreement was an important source of risk-free revenue for Defendant, since its compensation came entirely in the form of commissions and Defendant did not need to set aside reserves, pay distribution expenses, incur underwriting costs, training costs, et cetera. This is evinced by the fact that, "[b]y the end of 2007, [Phoenix] had trained and certified approximately **10,700, or 95%, of State Farm's approximately 11,300 securities licensed agents to sell Phoenix products**."[18]

39. Thousands of US households were solicited, induced, and/or targeted by State Farm agents and directed to acquire Phoenix life insurance policies or annuity contracts. Phoenix

---

[15] https://www.sec.gov/Archives/edgar/data/1129633/000111650210000184/pnx_10k.pdf.

[16] https://www.sec.gov/Archives/edgar/data/1129633/000111650209001703/pdfcopy-pnx_10q.pdf.

[17] https://www.sec.gov/Archives/edgar/data/1129633/000119312508043638/d10k.htm (emphasis added).

[18] *Id.* (emphasis added).

explains that "[o]ur relationship with State Farm gives us potential access to approximately 39% of the high-net-worth households in the U.S. **In 2007, State Farm accounted for approximately 15% of our total life premiums and 62% of our annuity deposits**."[19]

40. State Farm's relationship with purchasers of the Products did not stop once the purchase was finalized. Rather, the State Farm agents remained policyholders' primary point of contact, serving as the liaison between Phoenix (later PHL Variable) and policyholders, and ensuring policyholders' needs were addressed and handled. Moreover, it was common for policyholders to receive letters from Phoenix (later PHL Variable) either directly, or, passed through their State Farm agent, which letter directed policyholders to contact their specific State Farm agent for any service needed.

41. State Farm's continuing relationship with policyholders after the initial acquisition of the Phoenix life insurance policies or annuity contracts makes sense—State Farm earned significant, continuing revenue from the payment of premiums, in the form of trailer commissions. State Farm remained incentivized to ensure premiums were paid and policies remained in force.

42. A subsidiary of State Farm Mutual Automobile Company was Phoenix's "largest individual distributor of life insurance[,]"[20] and State Farm was also one of Phoenix's "largest distributors of annuities" along with National Life Group.[21]

### B. The State Farm and Phoenix Standstill and Shareholder's Agreements

43. In 2001, Phoenix's "underwriters [] reserved for possible sale to State Farm"

---

[19] https://www.sec.gov/Archives/edgar/data/1129633/000119312508043638/d10k.htm (emphasis added).

[20] *Id.* ("Our largest individual distributor of life insurance is a subsidiary of State Farm Mutual Automobile Company, or State Farm.").

[21] *Id.*

millions of shares that, if purchased, would allow State Farm to "own approximately 4.9% of the outstanding common stock of The Phoenix Companies, Inc. immediately following the offering."[22]

44. Phoenix "entered into a shareholder's agreement with State Farm that provide[d], among other things, for:

> -- the attendance of a **representative of State Farm at certain of [Phoenix] board and board planning committee meetings**, other than executive sessions; and
>
> -- the appointment of one or more **representatives of State Farm to an advisory committee** established by [Phoenix] to advise the management of [Phoenix Investment Partners, Ltd.] in connection with [Phoenix Investment Partners, Ltd.] business and operations."[23]

45. Pursuant to a Standstill Agreement, "State Farm agreed, for a period ending June 25, 2006, subject to certain enumerated exceptions, that, without the prior approval of the State of New York Insurance Department, it would not, directly or indirectly, acquire, offer to acquire or agree to acquire any shares of Common Stock if, following such acquisitions, it would **beneficially own more than 4.9 percent** of the outstanding shares of such stock."[24]

46. In 2002, Phoenix noted that after the initial public offering in which Defendant "acquired approximately 4.9% of [] outstanding shares of common stock[,]" Phoenix "commenc[ed] [a] subsequent stock repurchase program...."[25] Phoenix noted that "State Farm's

---

[22] https://www.sec.gov/Archives/edgar/data/1129633/000095012301502973/y44223a3s-1a.txt.

[23] https://www.sec.gov/Archives/edgar/data/1129633/000095012301503644/y44223b4e424b4.txt.

[24] https://www.sec.gov/Archives/edgar/data/1129633/000112963302000013/pnx2002_proxy.txt.

[25] https://www.sec.gov/Archives/edgar/data/1129633/000095012302011492/y66245sv3.htm

ownership of [] issued and outstanding common stock **may increase to 6%** as a result of any such repurchase program ....”[26]

47. Indeed, **State Farm owned more than “five percent of [Phoenix] outstanding common stock”** over the decade plus that Phoenix compensated State Farm for the sale of its insurance and annuity products.[27] Upon information and belief, the Shareholder Agreement was in place up until Phoenix went private in 2016.[28]

### C. Phoenix’s Downgrade and State Farm’s Suspension of Phoenix Product Sales

48. In 2009, State Farm suspended sales under the Agreement. This was significant because State Farm suspended sales seven (7) years before the Agreement’s 2016 end date.

49. State Farm suspended sales under the Agreement because Phoenix was downgraded and was no longer investment-grade.[29]

50. In a Form 10-Q from 2009, Phoenix explained: “We have recently been downgraded and had our outlook revised adversely.”[30] Phoenix went on to explain:

- On September 8, 2009, Moody’s Investor Services downgraded our

[26] *Id.* (emphasis added).

[27] *See supra* notes 8-15; *see also infra* notes 41-46.

[28] https://www.sec.gov/Archives/edgar/data/1129633/000112963302000013/pnx2002_proxy.txt (“Shareholder's Agreement. .... Unless this agreement is terminated by agreement of the Company and State Farm or any of certain related agreements are terminated or breached, this agreement will remain in effect for as long as State Farm and its affiliates own at least 4.9 percent of the outstanding shares of Common Stock.”).

[29] “Moving from a ‘BBB’ rating, which is investment grade, to ‘BB,’ which is below investment grade, can have severe effects on the price and prospects of a company or government that issued the bonds. **A rating below investment grade indicates deteriorating fundamentals** in the issuing company or government.” Adam Hayes, *Downgrade: What It Is, How It Works, and Warning Signs*, INVESTOPEDIA (last updated Dec. 30, 2023), available at www.investopedia.com/terms/d/downgrade.asp (emphasis added).

[30] https://www.sec.gov/Archives/edgar/data/1129633/000111650209001703/pdfcopy-pnx_10q.pdf.

> financial strength rating of Baa2 to Ba1 and lowered our senior debt rating from Ba2 to B1. They maintained their negative outlook on all ratings.
>
> - On August 6, 2009, Standard & Poor's downgraded our financial strength rating of BBB- to BB and lowered our senior debt rating from B+ to B-. They maintained their negative outlook on all ratings.
> - On March 10, 2009, A.M. Best Company, Inc. downgraded our financial strength rating to B++ from A and downgraded our senior debt rating to bb+ from bbb and maintained its negative outlook.
>
> These **downgrades have materially and adversely affected new sales, persistency, our relationships with distributors and our financial results, and have reduced our ability to borrow**. Further declines in ratings would likely also materially and adversely affect our sales, persistency, our relationships with distributors and our financial results.[31]

51. For reasonable individuals like Plaintiffs and Class Members, this information is difficult to decipher, let alone access in the first instance.

52. However, Defendant, as a sophisticated insurance company and Phoenix insider and significant shareholder, knew this downgrading was highly significant and would likely impact Plaintiffs' and Class Members' policies. Phoenix's financial strength rating being downgraded from Baa2 to Ba1 changed PHL's rating from that of "**Investment**-Grade" to merely "**Speculative**-Grade."[32]

53. In light of the downgrade, "[i]n March 2009, State Farm Mutual Automobile Insurance Company ("State Farm") **suspended the sale of Phoenix products** pending a re-

---

[31] https://www.sec.gov/Archives/edgar/data/1129633/000111650209001703/pdfcopy-pnx_10q.pdf.

[32] *See, e.g.*, Moody's Investors Service, *Moody's Rating Symbols & Definitions* (May 2009), at 10, PDF available at https://www.moodys.com/sites/products/productattachments/moodys%20rating%20symbols%20and%20definitions.pdf.

evaluation of the relationship between the two companies."[33]

54. According to State Farm spokesman Dick Luedke, "[t]he primary reason [State Farm suspended sales of Phoenix insurance policies and annuities] is the recent financial strength downgrades by rating agencies[.]"[34] State Farm "was responsible for 27 percent, or $91.6 million, of Phoenix's total new life insurance sales in 2008, measured by premiums."[35]

55. Rather than sever ties with Phoenix or take action to protect or make whole Plaintiffs and Class Members, Defendant and Phoenix restructured their agreement on July 30, 2009.[36]

56. Pursuant to the restructured Agreement, Defendant stopped selling Phoenix products. Phoenix's Form 10-Q stated that "the restructured agreement does not provide for any new sales of our products through the State Farm distribution system."[37]

57. Nevertheless, Defendant and Phoenix "amend[ed] the existing agreement to clarify the service and support [Phoenix] will provide to customers who purchased their policies and contracts through a State Farm agent, as well as State Farm agents themselves."[38]

58. Defendant's decision to continue providing services for pre-existing Phoenix

---

[33] https://www.sec.gov/Archives/edgar/data/1129633/000111650209001703/pdfcopy-pnx_10q.pdf (emphasis added).

[34] Diane Levick, *State Farm Suspends Sales Of Phoenix Cos. Products*, PROPERTY AND CASUALTY NEWS (Mar. 5, 2009), available at https://insurancenewsnet.com/oarticle/State-Farm-Suspends-Sales-Of-Phoenix-Cos-Products-a-103919.

[35] *Id.*

[36] https://www.sec.gov/Archives/edgar/data/1129633/000111650209001703/pdfcopy-pnx_10q.pdf.

[37] https://www.sec.gov/Archives/edgar/data/1129633/000111650209001703/pdfcopy-pnx_10q.pdf.

[38] *Id.*

policies and contracts—including those of Plaintiffs and putative Class Members—affected "approximately 90,000 inforce Phoenix policies and contracts sold through State Farm agents."[39]

59. Defendant's decision to continue its contract with Phoenix was to ensure State Farm could continue to receive comission from Phoenix for Plaintiffs and Class Members premium payments, which is why they were intentionally left in the dark.

60. State Farm[40] continued receiving compensation in connection with those Phoenix life insurance policies and annuity contracts sold to Plaintiffs and Class Members. Phoenix reported the following compensation to State Farm in the years following the Phoenix downgrade:

(a) 2010: $4.4 to 4.6 million[41]

(b) 2011: $2.4 million[42]

(c) 2012: $2.3 million[43]

(d) 2013: $2.6 million[44]

(e) 2014: $2.7 million[45]

---

[39] *Id.*

[40] Compensation reported as paid to "entities that were either subsidiaries of State Farm or owned by State Farm agents." *see infra* notes 42-46, or "owned by State Farm employees," *see infra* note 41.

[41] "In 2010, our subsidiaries incurred total compensation of $4.4 million to entities which were either subsidiaries of State Farm or owned by State Farm employees, for the sale of our insurance and annuity products. During 2010, we made payments of $4.6 million to State Farm entities for this compensation." https://www.sec.gov/Archives/edgar/data/1129633/000119312511085807/ddef14a.htm.

[42] https://www.sec.gov/Archives/edgar/data/1129633/000112963314000005/pnx-20131231x10k.htm.

[43] *Id.*

[44] *Id.*

[45] https://www.sec.gov/Archives/edgar/data/1129633/000112963315000004/pnx-20141231x10k.htm.

(f) 2015: $3.0 million[46]

61. There were dates—in addition to State Farm's suspension of Phoenix Product sales in 2009 —when State Farm knew, or, by the exercise of reasonable diligence should have known, of facts or circumstances which would put a reasonable agent on notice that the insurance coverage through PHL Variable presented an unreasonable risk.

62. For example, in 2016, Nassau Financial took The Phoenix Companies private.[47] Part of this transaction included "PHL Variable Insurance Company ('PHL Variable'), one of Phoenix's operating subsidiaries."[48] Phoenix Products were subsequently transferred to PHL Variable through a series of restructuring transactions. PHL Variable repeatedly experienced solvency problems from the time Defendant stopped selling Phoenix products, through PHL Variable's eventual administrative supervision and rehabilitation. *See infra* ¶¶ 73-95. Industry insiders, like Defendant, have been aware of material facts surrounding PHL Variable's financial troubles, which facts would have been known by Defendant and not consumers like Plaintiffs and Class Members. Instead of sharing these material facts and issues, Defendant chose to conceal that material information from Plaintiffs and Class Members.

63. In 2019, "PHL entered several reinsurance deals with 'captive' and 'affiliated'

---

[46] https://www.sec.gov/Archives/edgar/data/1129633/000112963316000029/pnx-20151231x10k.htm.

[47] *See, e.g.*, Kerry Pechter, *Double Trouble in the Bermuda Triangle*, RETIREMENT INCOME JOURNAL (May 30, 2024), https://retirementincomejournal.com/article/double-trouble-in-the-bermuda-triangle ("Once part of the Hartford-based Phoenix Companies, PHL became part of Nassau Financial in 2016, when Nassau, then only a year old, bought the publicly-traded Phoenix, took it private, and retired the Phoenix brand.").

[48] https://www.sec.gov/Archives/edgar/data/1129633/000157104916016107/t1601599_ex99-1.htm; *see also* https://doi.sc.gov/DocumentCenter/View/12789/PHL-Variable-Insurance-Company.

reinsurers to reduce its liabilities and bolster its surplus."[49]

64. "In late 2021, PHL was separated from Nassau and transferred to a different Golden Gate Capital subsidiary, essentially isolating the failing business from Nassau's healthier life insurance units."[50]

65. In 2023, regulators placed PHL Variable under administrative supervision. "Rehabilitation is a court proceeding that a company's state insurance commissioner may initiate to take control of the company if it is in a hazardous financial condition."[51]

66. State Farm, knew or should have known of these circumstances, and either did or should have investigated the stability and suitability of PHL Variable's Phoenix Products before recommending or maintaining such coverage, especially given that PHL Variable, now private, was no longer required to "file periodic reports with the SEC[.]"[52]

67. Yet Defendant concealed these material facts and continued to collect commissions based on Phoenix/PHL Variable policies that State Farm placed with Plaintiffs and Class Members.

68. Indeed, Defendant was a significant shareholder in Phoenix during most of this time period, and were certainly aware of details that likely have not been made public.

69. State Farm had a continuing duty to warn Plaintiffs and Class Members about the financial condition of PHL Variable in each of these instances but failed to do so. Defendant knew that Plaintiffs and Class Members are unsophisticated parties when it comes to the complexities

[49] https://retirementincomejournal.com/article/double-trouble-in-the-bermuda-triangle/.

[50] https://insurancenewsnet.com/innarticle/a-decade-in-decline-phl-variable-serving-as-a-cautionary-tale.

[51] https://portal.ct.gov/cid/phl?language=en_US

[52] https://gbq.com/navigating-the-path-to-going-private-understanding-sec-requirements/

of insurance, corporate structures, and insolvencies. This is why Plaintiffs and Class Members utilized Defendant's services and trusted them in handling their life insurance policies.

70. Defendant's affirmative actions harmed the investments of Plaintiffs and Class Members. Defendant's decision to stop selling Phoenix products accelerated Phoenix's demise.

71. State Farm never informed Plaintiff and Class Members who purchased the Phoenix Products and services that (1) Phoenix had been downgraded; or that (2) State Farm stopped selling Phoenix Products.

72. Upon information and belief, State Farm actively concealed Phoenix's financial troubles from Plaintiff and Class Members.

**D. PHL Variable Insurance Co. and its Rehabilitation**

73. On March 31, 2023, Connecticut Insurance Department (the "CID") "placed [PHL Variable] under an order of administrative supervision ... having determined that regulatory supervision was appropriate to help safeguard the financial security of" PHL Variable.[53]

74. Over a year later, on May 20, 2024, PHL Variable and its subsidiaries, Concord Re, Inc. and Palisado Re, Inc, both of which were Connecticut captive reinsurance companies, were ordered into Rehabilitation by the CID (the "PHL Rehabilitation").

75. At the time, "**PHL ... ha[d] negative $900 million in capital and surplus**. Its 'aggregate assets [we]re projected to be exhausted in 2030' when 'approximately **$1.46 billion of**

[53] *See* Petition For Order Of Rehabilitation And Appointment Of State Insurance Commissioner As Rehabilitator Of PHL Variable Insurance Company, Concord Re, Inc., and Palisado Re, Inc. (May 17, 2024), available at https://retirementincomejournal.com/wp-content/uploads/2024/05/DocumentInquiry-PHL.pdf.

**policyholder liabilities will remain unpaid**,' according to the CID."[54]

76. In connection with the PHL Rehabilitation, the CID determined that "further transaction of business would be financially hazardous to its policyholders, creditors and the public."[55]

77. PHL Variable's rehabilitation would not have come as a surprise to Defendant, who had been fully aware of financial troubles facing PHL Variable since at least 2009.

78. As a result of the rehabilitation, the PHL Rehabilitator issued a Temporary Moratorium Order effective May 20, 2024, preventing or limiting policy withdrawals, surrenders and death benefit payouts.

79. On New Year's Eve, December 31, 2025, Plaintiffs and Class Members received—from PHL Variable and/or the State of Connecticut, but *not* State Farm—notice that the PHL Variable rehabilitation "is not feasible" and that PHL Variable and its subsidiaries "do not have the assets that would be necessary to transfer to a buyer or reinsurer any blocks of business without causing other policyholders to receive less than what they would receive from the guaranty associations in a conventional liquidation."[56]

80. Plaintiffs and Class Members were immediately harmed and will remain harmed with inadequate recourse regardless of the outcome of the PHL Rehabilitation. Plaintiffs and Class

---

[54] Kerry Pechter, *Double Trouble in the Bermuda Triangle*, RETIREMENT INCOME JOURNAL (May 30, 2024), https://retirementincomejournal.com/article/double-trouble-in-the-bermuda-triangle/ (citing Petition for Order Of Rehabilitation and Appointment Of State Insurance Commissioner as Rehabilitator Of PHL Variable Insurance Company, Concord Re, Inc., and Palisado Re, Inc. (May 17, 2024)).

[55] May 20, 2024 Order, available at https://civilinquiry.jud.ct.gov/DocumentInquiry/DocumentInquiry.aspx?DocumentNo=27532057

[56] https://portal.ct.gov/cid/-/media/cid/1_legal/report-of-the-rehabilitator-12-31-2025.pdf.

Members are definitively unable to obtain benefits to which they are entitled—despite paying hundreds of millions of dollars in premiums in connection with these benefits, and despite Defendant knowingly and willingly concealing and omitting Phoenix/PHL Variable's deteriorating financial condition and impending insolvency so it could continue collecting commissions on these premiums.

81. For example, Plaintiff Jennifer Nappo only received 15% of what she was owed under her term life insurance policy. Specifically, **Plaintiff Nappo collected just $300,001.76 of a $2,000,000 life insurance policy** after her late husband James Nappo passed. James Nappo passed tragically on April 28, 2024, *before* the Moratorium Order.

82. The Moratorium Order provided an aggregate limit of $300,000, "regardless of the … size" of the life insurance policy:

> *Aggregate Limit - Life Insurance Policies Covering One Individual*. Neither the General Account nor the Non-unitized Subaccount will individually or together pay more than $300,000 in the aggregate under one or more life insurance policies covering one individual regardless of who owns the policies or the number of beneficiaries.[57]

83. Defendant had the ability and obligation to prevent such enormous financial injury. Defendant could and should have spared Plaintiffs and Class Members from the anxiety, fear, and uncertainty now facing Plaintiffs, Class Members, their families, and their estates.

84. Plaintiffs will not be made whole, nor will State Farm be held remotely accountable, by the outcome of the PHL Rehabilitation. Here, the Insurance Commissioner of the State of Connecticut will be empowered to collect as well as distribute the remaining assets of PHL. As the Commissioner set out, at the time the Rehabilitation commenced, Phoenix had ***negative $900***

[57] https://portal.ct.gov/cid/-/media/cid/1_legal/phl-moratoriumorder.pdf.

***million*** in capital and surplus.[58] "As of September 30, 2025, on a combined basis, the Companies' approximate capital and surplus remained stable at ***negative $2.2 billion***[,]"[59] and, by 2030, approximately ***$1.46 billion of policyholder liabilities will remain unpaid***.[60]

85. Plaintiffs and Class Members are only one of many creditors the Commissioner will attempt to distribute funds to—to the extent they can. It is almost certain that Plaintiff and Class Members will not receive the entirety of what they are owed.

86. But in no situation can the Commissioner seek and distribute assets of State Farm to satisfy the claims of PHL Variable creditors.

87. The Connecticut state liquidation proceeding does not contain the same parties nor is it seeking to hold State Farm liable for the claims asserted herein. The Connecticut state liquidation proceeding will not dispose of any claims presented in this federal case.

88. Had Plaintiffs and Class Members been notified of Phoenix/PHL Variable's financial condition prior to 2024, they could have exchanged their Phoenix life insurance and annuity products for more suitable products.

89. Specifically, Plaintiffs and Class Members could have performed an exchange of insurance policies under 26 U.S.C. § 1035 (a "1035 Exchange").

90. A 1035 Exchange allows policyholders to transfer funds from a life insurance

---

[58] *See* https://retirementincomejournal.com/wp-content/uploads/2024/05/DocumentInquiry-PHL.pdf (emphasis added).

[59] https://civilinquiry.jud.ct.gov/DocumentInquiry/DocumentInquiry.aspx?DocumentNo=31401323, at 14 (emphasis added).

[60] https://retirementincomejournal.com/article/double-trouble-in-the-bermuda-triangle/ (emphasis added) (citing Petition for Order Of Rehabilitation and Appointment Of State Insurance Commissioner as Rehabilitator Of PHL Variable Insurance Company, Concord Re, Inc., and Palisado Re, Inc. (May 17, 2024)).

policy, endowment, or annuity to a policy of a similar type. *See* 26 U.S.C. § 1035. The benefit of filing a 1035 Exchange request is that it allows the policyholder to transfer the funds without recognizing any gain or loss.

91. Additionally, had Plaintiffs and Class Members been notified of Phoenix/PHL Variable's financial troubles and downgrading to a speculative grade rating prior to 2024, Plaintiffs and Class Members could have simply surrendered their policies and purchased other suitable, less risky insurance products.[61]

92. In February of 2024, State Farm Senior Vice President, Financial Services, Joe Monk, boasted that State Farm agents have "**needs-based conversations** ... with customers **every day** in communities **across the country.**"[62]

93. In each of its press releases, State Farm emphasizes that, "[f]or over 100 years, the mission of State Farm has been to **help people manage the risks of everyday life**, recover from the unexpected and realize their dreams."[63]

94. Noticeably absent from any press releases or communications from Defendant to Plaintiffs and Class Members is any mention of Phoenix's current condition and the direct impacts it has on them. Upon information and belief, State Farm has yet to issue any notice, guidance, or other communication to Plaintiffs and Class Members regarding their PHL policies.

95. Defendant has failed Plaintiffs and Class members in all of these regards, and has

---

[61] "One of the most attractive reasons to purchase **permanent life insurance**, aside from the death benefit protection, is that it **can also be a wealth-building asset**. … Cash surrender value is the actual amount of money you will receive if you choose to terminate a permanent life insurance policy before its maturity date, or before you die." https://www.guardianlife.com/life-insurance/surrender (emphasis added).

[62] https://newsroom.statefarm.com/pacific-life-alliance/.

[63] *Id.*

abused its position of trust.

**E. Experiences of Plaintiffs**

***Plaintiff Gordon Jason***

96. Plaintiff Gordon Jason was induced and targeted by a State Farm agent to acquire a Phoenix Variable Universal Life policy in February of 2006 (the "Phoenix VUL Policy").

97. Plaintiff Jason is the trustee of the Gordon F. Jason Trust dated December 8, 2010 (the "Trust") that Plaintiff Jason created as grantor for the benefit of his wife Margaret A. Jason. The VUL Policy is owned by Plaintiff Jason and the Trust is the named beneficiary of the VUL Policy.

98. Plaintiff Jason has been a loyal State Farm customer since 1992 and currently maintains seven (7) State Farm policies, not including the Phoenix VUL Policy.

99. Plaintiff Jason maintained a relationship with a State Farm agent, Mr. Thomas Centeno ("Agent Centeno") from approximately 1996 until 2010. After 2010, Plaintiff Jason changed his insurance advisor to another State Farm agent by the name of Mr. Tim Curry.

100. Agent Centeno recommended that Plaintiff Jason purchase the Phoenix VUL policy in 2006 when Jason asked Agent Centeno to increase his State Farm VUL policy from $500,000 to $1,000,000 in coverage to protect his wife and ensure that she would be taken care of in the event of his premature death. Agent Centeno told Plaintiff Jason that State Farm no longer issued VUL policies and that the Phoenix VUL policy was the equivalent of his previously issued State Farm Management Corp. $500,000 VUL and suitable for Plaintiff Jason's estate planning needs.

101. Agent Centeno discouraged Plaintiff Jason from going to New York Life Insurance Company for VUL coverage, falsely claiming that Plaintiff Jason's Phoenix VUL policy was the equivalent of his previously issued State Farm VUL Policy.

102. State Farm and Agent Centeno were aware or should have been aware of Phoenix's risks at the time of sale of the policy, but withheld this information from Plaintiff Jason.

103. At no point did Agent Centeno or any State Farm representative inform Plaintiff Jason about the extent of Phoenix's financial difficulties.

104. At no point did Agent Centeno or any State Farm representative inform Plaintiff Jason that State Farm stopped selling Phoenix products and services in March 2009.

105. At no point did Agent Centeno or any other State Farm representative inform Plaintiff Jason of Agent Centeno's commission arrangement for the sale of the Phoenix VUL Policy.

106. Plaintiff Jason did not learn about the scope and magnitude of Phoenix's deteriorating financial condition until he received a letter from the State of Connecticut Department of Insurance in June of 2024, informing Plaintiff Jason of Rehabilitation Proceedings and the Moratorium Order that restricts withdrawals from his Phoenix VUL Policy and limits death benefit payouts to the Moratorium Cap limit of $300,000.

107. Prior to receiving this letter, detailed evidence of the facts alleged herein could only be found from piecing together SEC filings and a handful of insurance-related journals that are not widely circulated. Plaintiff Jason never viewed the SEC filings or the insurance journals. Based on the complexity and nature of the events that took place leading up to receiving the letter, Plaintiff Jason would not have understood the meaning, implications, or direct effects the event had on his policy even if he had read sources discussing the matter.

108. Moreover, Plaintiff Jason, as a reasonable individual, was not expected to track and understand complex SEC filings of his insurance provider. Instead, Plaintiff Jason, as a reasonable individual, relied on his State Farm agent, who was his point of contact for all things related to his

policy, to inform him of anything material or pertinent to his policy. Plaintiff Jason believed that his relationship with State Farm was one built on trust and confidence over three decades, and that he was deceived, betrayed and abandoned by State Farm.

109. Plaintiff Jason has already paid significant amounts of premiums for his life insurance policy. It is now clear Plaintiff Jason will not receive the benefit of his bargain. Plaintiff Jason faces constant anxiety, fear and uncertainty over his estate legacy, and his ability to provide for his wife when he passes.

***Plaintiff Jennifer Nappo***

110. Plaintiff Nappo was solicited, induced, and/or targeted by a State Farm agent to acquire a Phoenix term life insurance policy.

111. Plaintiff Nappo has been a loyal State Farm customer since 2007. Plaintiff Nappo maintained a relationship with a State Farm agent, Mr. James Flynn ("Agent Flynn"), from in or around 2007 until 2024.

112. In or around November 2007, Plaintiff Jennifer Nappo and her late husband, James Nappo, purchased a $2,000,000 Phoenix term life insurance policy (the "Term Life Policy") insuring the life of James.

113. The Term Life Policy was recommended to Plaintiff Nappo by their trusted State Farm agent, Agent Flynn. The life insurance policy was purchased as a part of the Nappo family's financial plan to make sure that Plaintiff Nappo and her two children would be taken care of, in the event that her husband died prematurely.

114. Plaintiff Nappo trusted Agent Flynn; over the years, Plaintiff Nappo had purchased life insurance, disability insurance, rental insurance, fire insurance, and car insurance from Agent Flynn.

115. James Nappo died tragically in April 2024 after a difficult twenty three month battle with glioblastoma, a malignant brain tumor.

116. State Farm and Agent Flynn were aware or should have been aware of Phoenix's risks at the time of sale of the policy, but withheld this information from Plaintiff Nappo.

117. Despite Agent Flynn and State Farm having known about Phoenix/PHL Variable's financial troubles, Agent Flynn nor State Farm ever said anything to Plaintiff or the Nappo's about the risks associated with Phoenix/PHL Variable.

118. At no point did Agent Flynn or State Farm inform Plaintiff Nappo that Phoenix had been downgraded. Nor was Plaintiff Nappo aware that Phoenix had been downgraded.

119. At no point did Agent Flynn or State Farm inform Plaintiff Nappo that State Farm stopped selling Phoenix Products and services. Nor was Plaintiff Nappo aware that State Farm stopped selling Phoenix Products and services.

120. At no point did Agent Flynn or State Farm inform Plaintiff Nappo of Agent Flynn's commission arrangement for the sale of the $2,000,000 term life insurance policy. Nor was Plaintiff Nappo aware that State Farm agents had a commission arrangement for the sale of Phoenix products and services like the Term Life Policy.

121. Plaintiff Nappo did not learn about the scope and magnitude of PHL Variable's financial condition until after her late husband passed. Only then was she was made aware of PHL Variable's Rehabilitation Proceedings and the Moratorium Order that limits death benefit payouts to the Moratorium Cap limit of $300,000.

122. Plaintiff Nappo's Hardship application was denied by the Rehabilitator.

123. Plaintiff Nappo's claim for additional funds made to the California Life and Health Guaranty Association was also denied.

124. Prior to this, detailed evidence of the facts alleged herein could only be found from piecing together SEC filings and a handful of esoteric insurance-related journals that are not widely circulated to the general public. Plaintiff Nappo never viewed the SEC filings or the insurance journals. Based on the complexity and nature of the events that took place, Plaintiff Nappo would not have understood the meaning, implications, or direct effects the event had on her policy even if she had read sources discussing the matter.

125. Moreover, Plaintiff Nappo, as a reasonable individual, was not expected to track and understand complex SEC filings of her insurance provider. Instead, Plaintiff Nappo, as a reasonable individual, relied on her State Farm agent, who was her point of contact for all things related to her policy, to inform her of anything material or pertinent to her policy.

126. Plaintiff Nappo has already paid significant amounts of premiums for his life insurance policy. It is now clear Plaintiff Nappo will not receive the benefit of her bargain. Plaintiff Nappo faces fear and uncertainty as a mother of two college age children who has been out of the work force for more than two decades.

127. Plaintiff Nappo believed that her relationship with State Farm was one built on trust and confidence over decades. She feels betrayed by State Farm and Agent Flynn, who let her and her family down.

***Plaintiff Patrick McLaughlin***

128. Plaintiff Patrick Mclaughlin was solicited, induced, and/or targeted by a State Farm agent to acquire a Variable Universal Life second to die survivorship policy insuring the lives of Lori Mclaughlin and Patrick Mclaughlin (the “VUL Policy”) with a base face amount of $1,500,000.

129. Plaintiff McLaughlin has been a loyal State Farm customer since in or around the

mid-1980s. Plaintiff Mclaughlin has maintained a relationship with a State Farm agent, Mr. Harlan Parker ("Agent Parker"), since the mid-1980s.

130. Agent Parker sold numerous insurance policies to the McLaughlin family dating back to the mid-1980's, including rental insurance, homeowners' insurance, ATV insurance, boat insurance, auto insurance, equipment insurance, an umbrella insurance policy, and life insurance.

131. At all times, Parker held himself out as someone that Plaintiff McLaughlin and his family could trust.

132. Shortly after the birth of his daughter, Plaintiff McLaughlin asked Agent Parker if he knew any estate planning attorneys in town and Agent Parker referred him to an estate planning attorney by the name of J. Joseph Morris ("Attorney Morris").

133. Attorney Morris prepared a Last Will and Testament for Patrick and Lori McLaughlin in 1995.

134. Attorney Morris also prepared a trust for the McLaughlin family in 2003.

135. Agent Parker solicited Plaintiff Mclaughlin to attend a seminar about life insurance and estate planning, which was hosted by Agent Parker's State Farm agency in Olathe, Kansas (the "Dog and Pony show"). Agent Parker gave a presentation about life insurance and estate planning at the Dog and Pony show, as did Attorney Morris.

136. Shortly after attending the Dog and Pony show in March 2004, Plaintiff McLaughlin and Lori McLaughlin went to Attorney Morris' office and a junior attorney in Morris' office prepared a second to die trust for purposes of holding the Phoenix VUL Policy recommended by Parker.

137. Agent Parker made numerous representations to the Mclaughlin's about the suitability of the VUL Policy for the McLaughlin's estate planning needs. Agent Parker told

Plaintiff McLaughlin that the Phoenix VUL Policy was a safe and secure estate planning investment that would protect Plaintiff Mclaughlin's children from estate taxes in the event of Plaintiff McLaughlin's or Plaintiff's wife's premature deaths.

138. Agent Parker and Attorney Morris both advised Plaintiff McLaughlin to create a specific second to die irrevocable life insurance trust ("ILIT") to hold the VUL Policy as its sole asset for estate and financial planning purposes.

139. State Farm and Agent Parker were aware or should have been aware of Phoenix's risks at the time of sale of the policy, but withheld this information from Plaintiff McLaughlin.

140. At no point did Agent Parker or State Farm inform Plaintiff McLaughlin that Phoenix had been downgraded. Nor was Plaintiff McLaughlin aware that Phoenix had been downgraded.

141. At no point did Agent Parker or State Farm inform Plaintiff McLaughlin that State Farm stopped selling Phoenix Products and services. Nor was Plaintiff McLaughlin aware that State Farm stopped selling Phoenix Products.

142. At no point did Agent Parker or State Farm inform Plaintiff McLaughlin of Agent Parker's commission arrangement for the sale of the Phoenix VUL Policy. Nor was Plaintiff McLaughlin aware that State Farm agents had a commission arrangement for the sale of Phoenix Products like his VUL Policy.

143. Despite Agent Parker having known about Phoenix/PHL Variable's financial troubles at least as early as 2009, Agent Parker never said anything to Plaintiff or the McLaughlin's about the risks associated with Phoenix/PHL Variable.

144. Upon information and belief, Agent Parker actively concealed Phoenix's financial troubles from Plaintiff McLaughlin and others who invested in Phoenix life insurance and annuity

products marketed by State Farm, its agents, subsidiaries and affiliates.

145. Plaintiff McLaughlin did not learn about the scope and magnitude of PHL Variable's financial condition until in or around late May 2024. Around this time, Plaintiff McLaughlin was first made aware of PHL Variable's Rehabilitation Proceedings and the Moratorium Order that limits death benefit payouts to the Moratorium Cap limit of $300,000, or, **$1,200,000 less than the death benefits contemplated by Plaintiff McLaughlin's VUL Policy**.

146. Prior to this, detailed evidence of the facts alleged herein could only be found from piecing together SEC filings and a handful of insurance-related journals that are not widely circulated. Plaintiff McLaughlin never viewed the SEC filings or the insurance journals. Based on the complexity and nature of the events that took place leading up to receiving the letter, Plaintiff McLaughlin would not have understood the meaning, implications, or direct effects the event had on his policy even if he had read sources discussing the matter.

147. Moreover, Plaintiff McLaughlin, as a reasonable individual, was not expected to track and understand complex SEC filings of his insurance provider. Instead, Plaintiff McLaughlin, as a reasonable individual, relied on his State Farm agent, who was his point of contact for all things related to his policy, to inform him of anything material or pertinent to his policy.

148. When Plaintiff McLaughlin raised his concerns about the rehabilitation proceedings with Agent Parker, he told Plaintiff McLaughlin that State Farm corporate directed Agent Parker to not discuss anything about PHL in detail.

149. Agent Parker knew that thousands of State Farm agents recommended Phoenix annuities and life insurance to their high-net-worth customers. Agent Parker also knew that State Farm agents earned millions in upfront commissions and trailer commissions by selling unsuitable annuity contracts and life insurance policies to their trusting customers, putting their own

economic interests in front of the financial interests of their customers.

150. Plaintiff McLaughlin believed that his relationship with State Farm was one built on trust and confidence over decades, and he feels betrayed by State Farm.

151. Plaintiff McLaughlin has already paid significant amounts of premiums for his life insurance policy. It is now clear Plaintiff McLaughlin will not receive the benefit of his bargain. Plaintiff McLaughlin faces fear and uncertainty over his estate legacy, and he has no idea how the PHL Variable Rehabilitation will impact his Phoenix VUL Policy and his ability to provide for his family when he passes.

***Plaintiff Rebecca Baldwin Johnson***

152. Plaintiff Rebecca Baldwin Johnson her three siblings, Stephen Baldwin, Elaine Baldwin Hunt, and Bradley R. Baldwin are the beneficiaries under a flexible premium, joint last to die, Estate Legacy III, universal life insurance policy issued by PHL Variable Insurance Company in 2005, insuring the lives of their parents, H. Richard Baldwin and Barbara E. Baldwin (the "Baldwin Second to Die Policy").

153. The Baldwin family relationship with State Farm dates back to the early 1960s. For decades, the family insured numerous cars and homes through State Farm. The Baldwin family also purchased flood insurance and renter's insurance for their family-owned businesses through State Farm.

154. In the late 1990s, Marty Joiner ("Agent Joiner"), a college friend of Plaintiff Johnson became the State Farm agent for the Baldwin family. Agent Joiner became their trusted advisor, taking care of all of the family's insurance needs.

155. In 2005, Mr. H. Richard Baldwin worked with Agent Joiner to purchase the Baldwin Second to Die Policy, and rolled the majority of his other insurance policies and

unrelated investments into the Baldwin Second to Die Policy that was recommended by Agent Joiner as suitable for the family's estate planning needs.

156. Mr. Baldwin passed away in 2023. His wife Barbara E. Baldwin survives him.

157. Agent Joiner quit servicing the Baldwin Second to Die Policy sometime in 2023, and transferred the Baldwin's information to another State Farm agent, Felix Villaverde ("Agent Villaverde") in Taylors, South Carolina.

158. State Farm and Agent Joiner were aware or should have been aware of Phoenix's risks at the time of sale of the policy, but withheld this information from Plaintiff Johnson.

159. At no point did Agent Joiner, Agent Villaverde, or State Farm inform Plaintiff Johnson that Phoenix had been downgraded. Nor was Plaintiff Johnson aware that Phoenix had been downgraded.

160. At no point did Agent Joiner, Agent Villaverde, or State Farm inform Plaintiff Johnson that State Farm stopped selling Phoenix Products and services. Nor was Plaintiff Johnson aware that State Farm stopped selling Phoenix Products.

161. At no point did Agent Joiner, Agent Villaverde, or State Farm inform Plaintiff Johnson of Agent Joiner's or Agent Villaverde's commission arrangement for the sale of the Phoenix Policy. Nor was Plaintiff Johnson aware that State Farm agents had a commission arrangement for the sale of Phoenix Products like hers.

162. It was not until May of 2024 that the Baldwin family received notice that PHL Variable Insurance Company had been placed into rehabilitation. Prior to this, detailed evidence of the facts alleged herein could only be found from piecing together SEC filings and a handful of insurance-related journals that are not widely circulated. Plaintiff Johnson never viewed the SEC filings or the insurance journals. Based on the complexity and nature of the events that took place

leading up to May 2024, Plaintiff Johnson would not have understood the meaning, implications, or direct effects the event had on her policy even if she had read sources discussing the matter.

163. Moreover, Plaintiff Johnson, as a reasonable individual, was not expected to track and understand complex SEC filings of her insurance provider. Instead, Plaintiff Johnson, as a reasonable individual, relied on her State Farm agent, who was her point of contact for all things related to her policy, to inform her of anything material or pertinent to his policy.

164. Accordingly, this disclosure came as a shock to the  family, who had relied upon the representations and recommendations of Agent Joiner, that the Baldwin Second to Die Policy would provide safe, secure, and reliable financial protection for Plaintiff Baldwin and her siblings in the event of their parents' deaths.

165. Plaintiff Baldwin and her parents have already paid significant amounts of premiums for the Baldwin Second to Die life insurance policy. It is now apparent to the Baldwin family that they will never receive the benefit of their bargain with respect to the policy purchased by the late H. Richard Baldwin based on recommendations from his trusted State Farm agent, causing them fear and uncertainty over their Policy.

***Plaintiffs William H. Jacobson and Karen R. Jacobson***

166. Plaintiff William H. Jacobson's parents relocated from Wyoming to Spring, Texas in the fall of 1983. They purchased home and automobile insurance from a local State Farm agent. In the early 1990s, that agent left State Farm and the policies were transferred to another State Farm agent by the name of Jeanna Wendt who worked with the Jacobson family until her retirement. Plaintiff Jacobson and his wife, Karen R. Jacobson, were introduced to Jeanna Denise Wendt ("Agent Wendt") by William's parents and purchased the automobile insurance, renter's insurance, and personal property insurance from State Farm.

167. In 2003, after purchasing a home, the Jacobsons replaced the renter's policy with a homeowner's insurance policy, also purchased through Agent Wendt at State Farm. Over the next two decades, they subsequently purchased nine vehicles and three residences that were likewise insured through State Farm and administered by Agent Wendt, as their trusted State Farm agent and advisor.

168. In 2008, prior to the birth of their second child, Mr. and Mrs. Jacobson sought out Agent Wendt for advice regarding their life insurance needs for their growing family. Agent Wendt, a long standing and trusted advisor to the Jacobson family, recommended that Mr. and Mrs. Jacobson each purchase a $1,000,000.00 face value 30-year term life insurance policy with a return of premium ("ROP") rider. The Jacobsons were told that the ROP rider would allow them to recoup all premiums paid for the term life coverage if they survived longer than 30 years. Mr. and Mrs. Jacobson each named each other as the primary policy beneficiary and their children as secondary beneficiaries with benefits to be allocated equally among their five children.

169. At some point in 2019, Agent Wendt relinquished the securities licenses necessary to support certain products, and the Jacobson policies were transferred by State Farm to the State Farm office of Kyle Sherburne, also known as Gary Kyle Sherburne ("Agent Sherburne").

170. It was not until Mr. and Mrs. Jacobson contacted State Farm in the spring of 2020 to inquire about the potential purchase of additional life insurance coverage that they found out that their State Farm policies had been transferred to Agent Sherburne. No additional life insurance was purchased at that time. Most importantly, no discussion occurred regarding the

financial condition, solvency, or stability of PHL Variable or the existing life insurance policies with the ROP rider.

171. Mr. and Mrs. Jacobson paid all policy premiums on time and in full for every policy year including 2026. At some point following 2016, the Jacobson's were informed that Nassau Re had acquired PHL Variable and they started sending premium payments made payable directly to Nassau Re, believing at all relevant times that Nassau Re owned PHL Variable.

172. State Farm, Agent Wendt, and Agent Sherburne were aware or should have been aware of Phoenix's risks at the time of sale of the policy, but withheld this information from Plaintiff Jacobson.

173. At no point did Agent Wendt, Agent Sherburne, or State Farm inform Plaintiff Jacobson that Phoenix had been downgraded. Nor was Plaintiff Jacobson aware that Phoenix had been downgraded.

174. At no point did Agent Wendt, Agent Sherburne, or State Farm inform Plaintiff Jacobson that State Farm stopped selling Phoenix Products and services. Nor was Plaintiff Jacobson aware that State Farm stopped selling Phoenix Products.

175. At no point did Agent Wendt, Agent Sherburne or State Farm inform Plaintiff Jacobson of their commission arrangement for the sale of the Phoenix Policy. Nor was Plaintiff Jacobson aware that State Farm agents had a commission arrangement for the sale of Phoenix Products like his.

176. It was not until May of 2024 that Mr. and Mrs. Jacobson received notice from the State of Connecticut Insurance Department that PHL Variable Insurance Company had been placed into rehabilitation.

177. Prior to this, detailed evidence of the facts alleged herein could only be found from piecing together SEC filings and a handful of insurance-related journals that are not widely circulated. Plaintiff Jacobson never viewed the SEC filings or the insurance journals. Based on the complexity and nature of the events that took place leading up to May 2024, Plaintiff Jacobson would not have understood the meaning, implications, or direct effects the event had on his policy even if he had read sources discussing the matter.

178. Moreover, Plaintiff Jacobson, as a reasonable individual, was not expected to track and understand complex SEC filings of his insurance provider. Instead, Plaintiff Jacobson, as a reasonable individual, relied on his State Farm agent, who was his point of contact for all things related to his policy, to inform him of anything material or pertinent to his policy.

179. At no time did any State Farm agent, including Ms. Wendt or Mr. Sherburne, disclose any concerns about PHL Variable, its solvency, ratings downgrades, deteriorating financial condition, the de-consolidation of PHL Variable by Nassau Re and its affiliates, or anything else related to their multi million dollar ROP policies that were slated to remain in force until 2036.

180. Accordingly, this disclosure came as a shock to the Jacobsons, who had relied upon the representations and recommendations of their trusted State Farm agents in believing the ROP policies would provide safe, secure, and reliable financial protection for their family.

181. It is now apparent to Mr. and Mrs. Jacobson that they will never receive the benefit of their bargain with respect to the two $1 million dollar policies they own, each with the ROP riders that they originally purchased based on recommendations from their trusted State Farm agent, causing them fear and uncertainty.

***Plaintiff Melissa J. Murren***

182. Plaintiff Murren is the owner of an Estate Legacy PHLVIC Second to Die Universal Life policy issued by PHL Variable, insuring the lives of her parents, Alf T. Hansen and Sophia Hansen (the "Murren Policy").

183. The Murren Policy was purchased by Ms. Murren's parents in 2008 through their trusted advisor and State Farm agent, Thomas V. Leonard ("Agent Leonard"). Plaintiff Murren is the sister of Plaintiff Hansen.

184. For many years, the Hansen family and Plaintiff Murren trusted State Farm, and Agent Leonard to advise them on their insurance needs. The Hansen family purchased homeowner's insurance, boat insurance, car insurance, personal articles insurance, and umbrella policies through Agent Leonard. Plaintiff Murren and her immediate family carried on that tradition, purchasing their insurance through State Farm and Agent Leonard.

185. Alf T. Hansen passed away in 2025. His wife Sophia Hansen survives him.

186. At no time did Agent Leonard or State Farm disclose any concerns about PHL Variable, its solvency, ratings downgrades, deteriorating financial condition, the de-consolidation of PHL Variable by Nassau Re and its affiliates, or anything else related to the Murren Policy.

187. State Farm and Agent Leonard were aware or should have been aware of Phoenix's risks at the time of sale of the policy, but withheld this information from Plaintiff Murren and her family.

188. Despite Agent Leonard and State Farm having known about Phoenix/PHL Variable's financial troubles, Agent Leonard nor State Farm ever said anything to Plaintiff or her family about the risks associated with Phoenix/PHL Variable.

189. At no point did Agent Leonard or State Farm inform Plaintiff Murren that Phoenix had been downgraded. Nor was Plaintiff Murren aware that Phoenix had been downgraded.

190. At no point did Agent Leonard or State Farm inform Plaintiff Murren that State Farm stopped selling Phoenix Products and services. Nor was Plaintiff Murren aware that State Farm stopped selling Phoenix Products and services.

191. At no point did Agent Leonard or State Farm inform Plaintiff Murren or her family of Agent Leonard's commission arrangement for the sale of the policy. Nor was Plaintiff Murren aware that State Farm agents had a commission arrangement for the sale of Phoenix products and services like hers.

192. It was not until May of 2024 that Ms. Murren received notice that PHL Variable Insurance Company had been placed into rehabilitation. Prior to this, detailed evidence of the facts alleged herein could only be found from piecing together SEC filings and a handful of insurance-related journals that are not widely circulated. Plaintiff Murren never viewed the SEC filings or the insurance journals. Based on the complexity and nature of the events that took place, Plaintiff Murren would not have understood the meaning, implications, or direct effects the event had on her policy even if she had read sources discussing the matter.

193. Moreover, Plaintiff Murren, as a reasonable individual, was not expected to track and understand complex SEC filings of her insurance provider. Instead, Plaintiff Murren, as a reasonable individual, relied on her State Farm agent, who was her point of contact for all things related to her policy, to inform her of anything material or pertinent to her policy.

194. This disclosure came as a shock to Plaintiff Murren and her family, who had relied upon the representations and recommendations of Agent Leonard that the Murren Policy would provide safe, secure, and reliable financial protection for her. It is now apparent to Ms.

Murren that she will never receive the benefit of their family's bargain with respect to the policy purchased by the late Alf T. Hansen and his wife Sophia Hansen based on recommendations from their trusted State Farm agent, Thomas V. Leonard.

***Plaintiff Amy E. Hansen***

195. Ms. Hansen is the owner of an Estate Legacy PHLVIC Second to Die Universal Life policy issued by PHL Variable, insuring the lives of her parents, Alf T. Hansen and Sophia Hansen (the "Hansen Policy").

196. The Hansen Policy was purchased by Ms. Hansen's parents in 2008 through their trusted advisor and State Farm agent, Thomas V. Leonard. Plaintiff Hansen is the sister of Plaintiff Murren.

197. For many years, the Hansen family trusted State Farm, and Agent Leonard to advise them on their insurance needs.

198. Alf T. Hansen passed away in 2025. His wife Sophia Hansen survives him.

199. At no time did Agent Leonard, or any other State Farm agent, disclose any concerns about PHL Variable, its solvency, ratings downgrades, deteriorating financial condition, the de-consolidation of PHL Variable by Nassau Re and its affiliates, or anything else related to the Hansen Policy.

200. State Farm and Agent Leonard were aware or should have been aware of Phoenix's risks at the time of sale of the policy, but withheld this information from Plaintiff Hansen and her family.

201. Despite Agent Leonard and State Farm having known about Phoenix/PHL Variable's financial troubles, Agent Leonard nor State Farm ever said anything to Plaintiff or her family about the risks associated with Phoenix/PHL Variable.

202. At no point did Agent Leonard or State Farm inform Plaintiff Hansen that Phoenix had been downgraded. Nor was Plaintiff Hansen aware that Phoenix had been downgraded.

203. At no point did Agent Leonard or State Farm inform Plaintiff Hansen that State Farm stopped selling Phoenix Products and services. Nor was Plaintiff Hansen aware that State Farm stopped selling Phoenix Products and services.

204. At no point did Agent Leonard or State Farm inform Plaintiff Hansen or her family of Agent Leonard's commission arrangement for the sale of the policy. Nor was Plaintiff Hansen aware that State Farm agents had a commission arrangement for the sale of Phoenix products and services like hers.

205. It was not until May of 2024 that Ms. Hansen received notice that PHL Variable Insurance Company had been placed into rehabilitation. Prior to this, detailed evidence of the facts alleged herein could only be found from piecing together SEC filings and a handful of insurance-related journals that are not widely circulated. Plaintiff Hansen never viewed the SEC filings or the insurance journals. Based on the complexity and nature of the events that took place, Plaintiff Hansen would not have understood the meaning, implications, or direct effects the event had on her policy even if she had read sources discussing the matter.

206. Moreover, Plaintiff Hansen, as a reasonable individual, was not expected to track and understand complex SEC filings of her insurance provider. Instead, Plaintiff Hansen, as a reasonable individual, relied on her State Farm agent, who was her point of contact for all things related to her policy, to inform her of anything material or pertinent to her policy.

207. This disclosure came as a shock to Ms. Hansen and her family, who had relied upon the representations and recommendations of Agent Leonard that the Hansen Policy would provide safe, secure, and reliable financial protection for her. It is now apparent to Ms. Hansen

that she will never receive the benefit of their family's bargain with respect to the policy purchased by the late Alf T. Hansen and his wife Sophia Hansen based on recommendations from their trusted State Farm agent, Thomas V. Leonard.

***Plaintiff Denise Werner***

208. Ms. Werner is the owner of a $500,000 Phoenix Protector Term insurance policy, with a 30 year return of premium ("ROP") guarantee, issued by PHL Variable (the "Werner ROP Term Policy") issued in 2007, with a current net surrender value of almost $16,000.

209. Ms. Werner purchased this policy for estate planning purposes from Christopher J. McLeod, her State Farm agent ("Agent McLeod").

210. Ms. Werner purchased several State Farm policies from Agent McLeod, and State Farm, including a term life policy issued by State Farm, and a homeowner's policy. She also has an auto insurance policy issued by another State Farm agent.

211. At no time did Agent McLeod or State Farm disclose any concerns about PHL Variable, its solvency, ratings downgrades, deteriorating financial condition, the de-consolidation of PHL Variable by Nassau Re and its affiliates, or anything else related to the Werner ROP Term Policy.

212. State Farm and Agent McLeod were aware or should have been aware of Phoenix's risks at the time of sale of the policy, but withheld this information from Plaintiff Werner and her family.

213. Despite Agent McLeod and State Farm having known about Phoenix/PHL Variable's financial troubles, Agent McLeod nor State Farm ever said anything to Plaintiff or her family about the risks associated with Phoenix/PHL Variable.

214. At no point did Agent McLeod or State Farm inform Plaintiff Werner that Phoenix

had been downgraded. Nor was Plaintiff Werner aware that Phoenix had been downgraded.

215. At no point did Agent McLeod or State Farm inform Plaintiff Werner that State Farm stopped selling Phoenix Products and services. Nor was Plaintiff Werner aware that State Farm stopped selling Phoenix Products and services.

216. At no point did Agent Leonard or State Farm inform Plaintiff Werner or her family of Agent McLeod's commission arrangement for the sale of the policy. Nor was Plaintiff Werner aware that State Farm agents had a commission arrangement for the sale of Phoenix products and services like hers.

217. It was not until May of 2024 that Ms. Werner received notice that PHL Variable Insurance Company had been placed into rehabilitation. Prior to this, detailed evidence of the facts alleged herein could only be found from piecing together SEC filings and a handful of insurance-related journals that are not widely circulated. Plaintiff Werner never viewed the SEC filings or the insurance journals. Based on the complexity and nature of the events that took place, Plaintiff Werner would not have understood the meaning, implications, or direct effects the event had on her policy even if she had read sources discussing the matter.

218. Moreover, Plaintiff Werner, as a reasonable individual, was not expected to track and understand complex SEC filings of her insurance provider. Instead, Plaintiff Werner, as a reasonable individual, relied on her State Farm agent, who was her point of contact for all things related to her policy, to inform her of anything material or pertinent to her policy.

219. This disclosure came as a shock to her, as she had relied upon the representations and recommendations of their State Farm Agent, Christopher J. McLeod, that the Werner ROP Term Policy would provide safe, secure, and reliable financial protection for her heirs.

220. Plaintiff Werner has already paid significant amounts of premiums. It is now apparent to Plaintiff Werner that she will never receive the benefit of her bargain with respect to the policy she purchased in 2007 based on the recommendation of her trusted State Farm agent.

***Plaintiff Lisa Rowe***

221. Plaintiff Rowe was solicited, induced, and/or targeted by a State Farm agent to acquire a Phoenix term life insurance policy.

222. Plaintiff Rowe and her late ex-husband, Ronald Gray, were loyal State Farm customers since 2000. Plaintiff Rowe maintained a relationship with a State Farm agent, Bob Bush ("Agent Bush"), from in or around 2000 until his retirement. After Agent Bush retired, Plaintiff Rowe's policies were transferred to another State Farm agent, Ray Guzman Jr. ("Agent Guzman").

223. In or around April 2009, Plaintiff Rowe and her late ex-husband, Ronald Gray purchased a $1,000,000 Phoenix Protector term life insurance policy (the "Gray Term Life Policy") insuring the life of Mr. Gray. Plaintiff Rowe was the beneficiary under the Gray Term Life Policy.

224. The Gray Term Life Policy was recommended to Plaintiff Rowe by their trusted State Farm agent, Agent Bush. The life insurance policy was purchased as a part of the Gray family's financial plan to make sure that Plaintiff Rowe and her two children would be taken care of, in the event of Mr. Gray's death.

225. Plaintiff Rowe trusted Agent Bush and considered him to be the Gray family's trusted advisor. Over the years, Plaintiff Rowe and Mr. Gray purchased State Farm life insurance policies, car insurance, and homeowner's insurance from Agent Bush.

226. Mr. Gray died in 2025.

227. Agent Bush never said anything to Plaintiff about the risks associated with Phoenix/PHL Variable.

228. State Farm and Agent Bush were aware or should have been aware of Phoenix's risks at the time of sale of the policy, but withheld this information from Plaintiff Rowe and her family.

229. Despite Agent Bush and State Farm having known about Phoenix/PHL Variable's financial troubles, Agent Bush, Agent Guzman, and State Farm never said anything to Plaintiff or her family about the risks associated with Phoenix/PHL Variable.

230. At no point did Agent Bush, Agent Guzman, or State Farm inform Plaintiff Rowe that Phoenix had been downgraded. Nor was Plaintiff Rowe aware that Phoenix had been downgraded.

231. At no point did Agent Bush, Agent Guzman, or State Farm inform Plaintiff Rowe that State Farm stopped selling Phoenix Products and services. Nor was Plaintiff Rowe aware that State Farm stopped selling Phoenix Products and services.

232. At no point did Agent Leonard, Agent Guzman, or State Farm inform Plaintiff Rowe or her family of the Agents' commission arrangement for the sale of the policy. Nor was Plaintiff Rowe aware that State Farm agents had a commission arrangement for the sale of Phoenix products and services like hers.

233. Plaintiff Rowe did not learn about the scope and magnitude of PHL Variable's financial condition until after her ex-husband passed away in 2025. Only then was she was made aware of PHL Variable's Rehabilitation Proceedings and the Moratorium Order that limits death benefit payouts to the Moratorium Cap limit of $300,000. Plaintiff Rowe received only $300,000 of the $1,000,000 she was due under the Gray Term Life Policy as a result of the Moratorium

Order.

234. Prior to this, detailed evidence of the facts alleged herein could only be found from piecing together SEC filings and a handful of insurance-related journals that are not widely circulated. Plaintiff Rowe never viewed the SEC filings or the insurance journals. Based on the complexity and nature of the events that took place, Plaintiff Rowe would not have understood the meaning, implications, or direct effects the event had on her policy even if she had read sources discussing the matter.

235. Moreover, Plaintiff Rowe, as a reasonable individual, was not expected to track and understand complex SEC filings of her insurance provider. Instead, Plaintiff Rowe, as a reasonable individual, relied on her State Farm agent, who was her point of contact for all things related to her policy, to inform her of anything material or pertinent to her policy.

236. Plaintiff Rowe has already paid significant amounts of premiums. It is now apparent to Plaintiff Rowe that she will never receive the benefit of her bargain with respect to the policy she purchased based on the recommendation of her trusted State Farm agent.

237. Plaintiff Rowe believed that her relationship with State Farm was one built on trust and confidence over decades. She feels betrayed by State Farm, Agent Bush, and Agent Guzman, who let her and her family down.

***Plaintiff Judith Greenlaw***

238. Plaintiff Greenlaw is the beneficiary under a $2,000,000 return of premium ("ROP") term life insurance policy, issued by PHL Variable insuring the life of her late son, Paul Greenlaw, M.D. (the "Greenlaw Policy").

239. Plaintiff Greenlaw's son Paul was solicited, induced, and/or targeted by a State Farm agent by the name of George C. Finklea a/k/a Chuck Finklea ("Agent Finklea") who was

well known in Wilson, North Carolina area to acquire a Phoenix term life insurance policy.

240. Dr. Paul Greenlaw was a loyal State Farm customer and relied upon Agent Finklea for many different insurance needs, including two homeowner's insurance policies, multiple automobile insurance policies and multiple boat insurance policies. The late Dr. Greenlaw maintained a long-standing relationship of trust and confidence with Agent Finklea.

241. In or around July 2006, Dr. Greenlaw purchased a $2,000,000 term life insurance policy, with a return of premium ("ROP") rider (the "Greenlaw Term Life Policy") insuring his life, and naming his mother, Plaintiff Greenlaw, as beneficiary.

242. The Greenlaw Term Life Policy was highly recommended to Dr. Greenlaw by his trusted State Farm agent, Chuck Finklea.

243. Dr. Greenlaw died in 2025.

244. The late Dr. Greenlaw received notices of the PHL Variable insolvency and rehabilitation in or around May 2024.

245. In June 2024, Dr. Greenlaw reached out to Agent Finklea via text message to ask for his guidance. Agent Finklea replied only that he would "check on this."

246. On November 5, 2024, Dr. Greenlaw again reached out to Agent Finklea, this time via email. He specifically asked Agent Finklea, "If I die this week, will the policy be paid out if full for the value of the policy? This obviously is the most important question to have answered. If it will not pay out the policy in full, should I continue to pay these premiums or let the policy lapse and seek new term life insurance policy at potentially lower rates?" Agent Finklea replied to Dr. Greenlaw only that he would "recheck on your questions asap."

247. After Dr. Greenlaw's death in 2025, Plaintiff Judith Greenlaw, the beneficiary under the Greenlaw Policy received only $300,000 of the $2,000,000 she was due under the

Greenlaw Term Policy as a result of the Moratorium Order. The $300,000 was paid to Plaintiff Judith Greenlaw in August 2025.

248. Plaintiff Judith Greenlaw has maintained a claim against the PHL Estate in Rehabilitation for the shortfall death benefit amount of approximately $1,700,000, since August 2025, none of which has been paid to date.

249. On December 31, 2025, the Rehabilitator for PHL Variable filed a report with the Connecticut Superior Court, Docket No. 232.00, announcing that the Rehabilitation was going to be converted to a Liquidation and as a result, Plaintiff Judith Greenlaw's $1,700,000 death benefit shortfall claim, pending since August 2025, would likely be limited to the applicable state guaranty association coverage limits. Even in the best-case scenario, Plaintiff Judith Greenlaw will not receive the benefit of the bargain and instead will receive substantially less than the $2,000,000 death benefit contemplated by the Greenlaw Term Policy.

***Plaintiff Billy Sisco***

250. Plaintiff Billy S. Sisco was solicited, induced, and/or targeted by State Farm agent to acquire a Phoenix Universal Life Insurance Policy.

251. Plaintiff Sisco has been a loyal State Farm customer since about 1995. Plaintiff maintained a relationship with a State Farm agent Kathy Thurmond ("Agent Thurmond") from in or around 1995 to 2026.

252. In or around November 27, 2006, Plaintiff purchased a Phoenix Universal Life Policy in the amount of $667,000 insuring the life of Billy S Sisco.

253. The Policy was recommended to Plaintiff by their trusted State Farm agent, Kathy Thurmond. The policy was purchased to provide financial support for Plaintiff's spouse.

254. Plaintiff retired from United States Government Service in December 2006. The Phoenix Life Insurance policy was purchased to replace a survivors annuity on his government annuity.

255. During a long meeting with Agent Thurmond, it was shown to him that the Phoenix Life Insurance Policy would provide enough funds that if invested at 6% would provide the same income for his spouse as the survivors annuity on his government pension. The premium for the life insurance policy was much less than the cost of purchasing a survivors annuity from the government retirement plan on retirement. As a result, Plaintiff Sisco replaced the survivor's annuity with the Phoenix Life Insurance Policy, leaving Plaintiff feeling secure in his spouse's financial future.

256. Had Agent Thurmond advised Plaintiff of the uncertain future, or failure of Phoenix Life when it first was known to State Farm, he would have had an opportunity to make other financial arrangements for his surviving spouse. At Plaintiff's current age of 69 there is no affordable way to replace what has been taken from his surviving spouse. The decisions made to purchase the life insurance policy and not purchase the government retirement survivor's annuity is set in stone. The government won't allow the decision to be changed. The $667,000 Phoenix policy was the only financial support for his surviving spouse.

257. State Farm and Agent Thurmond were aware or should have been aware of Phoenix's risks at the time of sale of the policy, but withheld this information from Plaintiff Thurmond and his family.

258. Despite Agent Thurmond and State Farm having known about Phoenix/PHL Variable's financial troubles, Agent Thurmond and State Farm never said anything to Plaintiff or his family about the risks associated with Phoenix/PHL Variable.

259. At no point did Agent Thurmond or State Farm inform Plaintiff Sisco that Phoenix had been downgraded. Nor was Plaintiff Sisco aware that Phoenix had been downgraded.

260. At no point did Agent Thurmond or State Farm inform Plaintiff Sisco that State Farm stopped selling Phoenix Products and services. Nor was Plaintiff Sisco aware that State Farm stopped selling Phoenix Products and services.

261. At no point did Agent Thurmond or State Farm inform Plaintiff Sisco or his family of the Agents' commission arrangement for the sale of the policy. Nor was Plaintiff Sisco aware that State Farm agents had a commission arrangement for the sale of Phoenix products and services like his.

262. Plaintiff Sisco trusted Agent Thurmond as she had always provided advice on policies and sold Plaintiff policies for years for homeowners insurance, life insurance, and automobile insurance.

263. It was not until August 2025 that Plaintiff Sisco found out about the scope and magnitude of PHL Variable's financial condition. Plaintiff Sisco found out through a tip off from Agent Thurmond, instructing him to call the Phoenix information line. Plaintiff received a notice from Phoenix only after he made this call in September 2025.

264. Only then was Plaintiff Sisco made aware of PHL Variable's Rehabilitation Proceedings and the Moratorium Order that limits death benefit payouts to the Moratorium Cap limit of $300,000.

265. Prior to this, detailed evidence of the facts alleged herein could only be found from piecing together SEC filings and a handful of insurance-related journals that are not widely circulated. Plaintiff Sisco never viewed the SEC filings or the insurance journals. Based on the complexity and nature of the events that took place, Plaintiff Sisco would not have understood the

meaning, implications, or direct effects the event had on his policy even if he had read sources discussing the matter.

266. Moreover, Plaintiff Sisco, as a reasonable individual, was not expected to track and understand complex SEC filings of his insurance provider. Instead, Plaintiff Sisco, as a reasonable individual, relied on his State Farm agent, who was his point of contact for all things related to his policy, to inform him of anything material or pertinent to his policy.

267. It is now apparent to Plaintiff Sisco that he will never receive the benefit of his bargain with respect to the policy he purchased based on the recommendation of his trusted State Farm agent.

268. Plaintiff Sisco believed that his relationship with State Farm was one built on trust and confidence over decades. He feels betrayed by State Farm and Agent Thurmond who let him and his family down.

***Plaintiff Angela Santos Furey***

269. Plaintiff Angela Santos Furey's parents Daniel and Carlos Santos were solicited, induced, and/or targeted by a State Farm agent to acquire a Phoenix Nassau Estate Legacy Second to Die Life Insurance policy ("Second to Die Policy").

270. Plaintiff and her family have been a loyal State Farm customer for over 40 years and has maintained a relationship with a State Farm agent, Cheryl A. Estep ("Agent Estep").

271. In or around November 2004, Plaintiff's parents purchased the $5,000,000 Second to Die Policy to go to the Santos Childrens Trust, of which Plaintiff Santos is a beneficiary of.

272. The Policy was recommended to Plaintiff by their trusted State Farm agent, Cheryl Estep. The policy was purchased to provide financial stability to her family, especially for

Plaintiff's disabled brother in the event of their parents passing.

273. Plaintiff trusted Agent Estep over many years, as Agent Estep sold and managed her and her family's multiple business and personal State Farm policies, of which Agent Estep received large commissions for.

274. Despite Agent Estrep and State Farm having known about Phoenix/PHL Variable's financial troubles, Agent Estrep and State Farm never said anything to Plaintiff about the risks associated with Phoenix/PHL Variable.

275. In fact, just prior to Carol Santos death in 2021, the premiums jumped due to both insured ages from approximately $20,000 a year to over $300,000 a year. Plaintiff and her family were rightfully concerned and reached out to Agent Estrep to discuss what this meant for them and their policy. On behalf of Plaintiff and her family, Agent Estrep engaged in numerous conversations with Nassau/Phoenix regarding Plaintiff's concerns about continuing this policy with Nassau/Phoenix due to affordability. Plaintiff sought information to assure her that Nassau/Phoenix was in good financial health.

276. Plaintiff and her family made clear to Agent Estrep and State Farm that Carol Santos had to take an equity loan out on her residence to pay sky rocketing premiums. These equity monthly payments to the bank were nearly $20k, which was decimating their finances.

277. When Carol Santos passed away, her personal residence was immediately sold to pay off equity line to stop the financial bleeding.

278. At no point did Agent Estrep or State Farm inform Plaintiff that Phoenix had been downgraded. Nor was Plaintiff aware that Phoenix had been downgraded. Instead, Plaintiff and her family were assured by Agent Estrep on numerous occasions that Nassau/Phoenix was in fine financial standing.

279. State Farm and Agent Estrep were aware or should have been aware of Phoenix's risks at the time of sale of the policies, but withheld this information from Plaintiff Santos and her family.

280. Despite Agent Estrep and State Farm having known about Phoenix/PHL Variable's financial troubles, Agent Estrep and State Farm never said anything to Plaintiff or her family about the risks associated with Phoenix/PHL Variable.

281. At no point did Agent Estrep or State Farm inform Plaintiff Santos that Phoenix had been downgraded. Nor was Plaintiff Santos aware that Phoenix had been downgraded.

282. At no point did Agent Estrep or State Farm inform Plaintiff Santos that State Farm stopped selling Phoenix Products and services. Nor was Plaintiff Santos aware that State Farm stopped selling Phoenix Products and services.

283. Plaintiff did not learn about the scope and magnitude of PHL Variable's financial condition until 2024, when she received notification from the Connecticut bankruptcy proceeding. Only then was she made aware of PHL Variable's Rehabilitation Proceedings and the Moratorium Order that limits death benefit payouts to the Moratorium Cap limit of $300,000.

284. Plaintiff's Hardship applications were denied by the Rehabilitator. Plaintiff Santos submitted three applications, each including well over one hundred pages of financial. documents, yet they all were rejected. Each time Plaintiff submitted an application, she received continuous requests to produce "further documentation."

285. Prior to this, detailed evidence of the facts alleged herein could only be found from piecing together SEC filings and a handful of insurance-related journals that are not widely circulated. Plaintiff Santos never viewed the SEC filings or the insurance journals. Based on the complexity and nature of the events that took place, Plaintiff Santos would not have understood

the meaning, implications, or direct effects the event had on her policy even if she had read sources discussing the matter.

286. Moreover, Plaintiff Santos, as a reasonable individual, was not expected to track and understand complex SEC filings of her insurance provider. Instead, Plaintiff Santos, as a reasonable individual, relied on her State Farm agent, who was her point of contact for all things related to her policy, to inform her of anything material or pertinent to his policy.

287. It is now apparent to Plaintiff Santos that she will never receive the benefit of her bargains with respect to the policies she purchased based on the recommendation of her trusted State Farm agent.

288. Plaintiff faces fear and uncertainty as the death benefits were supposed to fund her disabled son for life. Plaintiff believed that her relationship with State Farm was one built on trust and confidence over decades. She feels betrayed by State Farm and Agent Estrep, who let her and his/her family down.

***Plaintiff Gregory Wright***

289. Plaintiff Gregory Wright was solicited, induced, and/or targeted by a State Farm agent to acquire a Phoenix Term Life insurance policy.

290. Plaintiff has been a loyal State Farm customer since 1997.

291. Plaintiff maintained a relationship with a State Farm agent, Kristie Powell, from around 1996 to 2004.

292. In or around 1999, Plaintiff Wright and his wife, Rebecca Wright, each purchased a $1,000,000 Phoenix Term Life insuring the lives of Gregory Wright and Rebecca Wright. Rebecca Wright's term life policy was supposed to be a 30-year policy, but was only entered for 20 years, and has since expired.

293. Plaintiff Wright's Phoenix Term Life Policy (the "Term Life Policy") was recommended to Plaintiff by his trusted State Farm agent, Kristie Powell ("Agent Powell"). The Term Life Policy was purchased as part of the Wright family's financial plan to make sure their family would be taken care of financially.

294. Plaintiff Wright trusted Agent Powell. Over the years, Rebecca Wright's parents had been life insurance and other policyholders with State Farm. Additionally, Plaintiff Wright's automobile and home insurance are with State Farm.

295. Sometime after 2006, Plaintiff changed State Farm Agents to Laurie Halihan ("Agent Halihan").

296. At no point did Agent Halihan inform Plaintiff that Phoenix had been downgraded. Nor was Plaintiff aware that Phoenix had been downgraded.

297. At no point did Agent Halihan inform Plaintiff that State Farm stopped selling Phoenix Products and services. Nor was Plaintiff aware that State Farm stopped selling Phoenix Products and services.

298. At no point did Agent Halihan inform Plaintiff of Agent Halihan's commission arrangement for the sale of the Policy. Nor was Plaintiff aware that State Farm agents had a commission arrangement for the sale of Phoenix products and services like the Policy.

299. Plaintiff received a letter from the State of Connecticut Department of Insurance providing an update regarding the rehabilitation of PHL Variable in August of 2025. However, Plaintiff did not understand the scope and magnitude of Phoenix's financial condition until Agent Halihan notified Plaintiff in December 2025 of a pending lawsuit. Agent Halihan learned about Phoenix/PHL Variable's lawsuit in December 2025, but said that correspondence had been circulating internally prior to that date.

300. Prior to this, detailed evidence of the facts alleged herein could only be found from piecing together SEC filings and a handful of insurance-related journals that are not widely circulated. Plaintiff Wright never viewed the SEC filings or the insurance journals. Based on the complexity and nature of the events that took place, Plaintiff Wright would not have understood the meaning, implications, or direct effects the event had on his policy even if he had read sources discussing the matter.

301. Moreover, Plaintiff Wright, as a reasonable individual, was not expected to track and understand complex SEC filings of his insurance provider. Instead, Plaintiff Wright, as a reasonable individual, relied on her State Farm agent, who was his point of contact for all things related to his policy, to inform him of anything material or pertinent to his policy.

302. Plaintiff continues to pay the premium for a $1 million dollar Term Life Policy. No option was given to Plaintiff to adjust the premium.

303. Plaintiff believed that his and his family's relationship with State Farm was one built on trust and confidence over decades. He feels betrayed by State Farm and Agent Kristie Powell, who let him and his family down.

## CLASS ACTION ALLEGATIONS

304. Plaintiffs bring this action individually and as representatives of all those similarly situated, pursuant to Federal Rule of Civil Procedure 23, on behalf of the below-defined Classes:

(a) Plaintiffs seek to represent a class defined as all persons in the United States who acquired rights under life insurance policies or annuity contracts offered by The Phoenix Companies, Inc. (the "Phoenix Products") sold by Defendant, or purchased the Phoenix Products from State Farm through State Farm agents (the "Class").

(b) Plaintiff Jason and Plaintiff Werner also seek to represent a subclass of all Class Members who acquired rights under life insurance policies or annuity contracts offered by The Phoenix Companies, Inc. (the

"Phoenix Products") sold by Defendant, or purchased the Phoenix Products from State Farm through State Farm agents, in Illinois (the "Illinois Subclass").

(c) Plaintiff Nappo, Plaintiff Santos, and Plaintiff Wright also seek to represent a subclass of all Class Members who acquired rights under life insurance policies or annuity contracts offered by The Phoenix Companies, Inc. (the "Phoenix Products") sold by Defendant, or purchased the Phoenix Products from State Farm through State Farm agents, in California (the "California Subclass").

(d) Plaintiff Rowe also seeks to represent a subclass of all Class Members who acquired rights under life insurance policies or annuity contracts offered by The Phoenix Companies, Inc. (the "Phoenix Products") sold by Defendant, or purchased the Phoenix Products from State Farm through State Farm agents, in New Jersey (the "New Jersey Subclass").

305. The Class and Subclasses are collectively referred to as the "Classes."

306. Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Classes may be expanded or narrowed by amendment to the complaint or narrowed at class certification.

307. Specifically excluded from the Classes are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

308. **Numerosity**: The members of the Classes are so numerous that joinder of all members is impractical, which, upon information and belief, number in the thousands. In 2007 alone, Defendant accounted for 15% of Phoenix's total life premiums and 62% of its annuity

deposits. Defendant was Phoenix's largest distributor of life insurance.

309. **Commonality**: There are questions of law and fact common to the Classes because Class Members' claims are identical to one another and predicated on the common contention that they were injured by having been solicited, induced, and/or targeted by State Farm agents to purchase and actually did life insurance policies or annuity contracts offered by The Phoenix Companies, Inc., and Defendant violated its fiduciary and professional duties, violations of state consumer protection laws, and breach of the covenant of good faith and fair dealing, with respect to those products. Proceeding as a class action will generate answers to common questions that are apt to drive resolution of the litigation. Such common questions include, but are not limited to:

(a) Whether State Farm breach its fiduciary duties by failing to properly notify Plaintiffs and Class Members;

(b) Whether State Farm engaged in unfair and deceptive conduct by misrepresenting, concealing, suppressing, or omitting that Phoenix's financial condition was threatened;

(c) Whether State Farm abused its position of superior knowledge and sophistication to collect compensation in connection with the Phoenix products;

(d) The proper form of equitable relief;

(e) The proper measure of monetary relief.

310. **Typicality**: The named Plaintiffs' claims are typical of the Class's claims. The named Plaintiffs' claims arise from the same conduct, and seek to redress the same legal violations, as the Class's claims.

311. **Adequacy**: The named Plaintiffs will fairly and adequately protect the interests of the Class. The named Plaintiffs have no interest antagonistic to those of the other Class Members. The named Plaintiffs are committed to the vigorous prosecution of this action. They have retained

counsel who are experienced and competent in the prosecution of large class actions.

312. **Rule 23(b)(1)**: The prerequisites for a (b)(1) class are satisfied. Prosecution of separate actions by Class Members would risk establishing incompatible standards of conduct for Defendant. Additionally, adjudications as to individual Class Members would, as a practical matter, dispose of the interests of other members of the Class and substantially impair their ability to protect their interests.

313. **Rule 23(b)(3)**: The prerequisites for a Rule 23(b)(3) class are satisfied because common questions of law and fact predominate and are susceptible to class-wide proof. Classwide litigation of this action is also superior to individual litigation because there are no difficulties in managing this case as a class action and there is a strong need to concentrate the Class Members' claims in one action.

## CAUSES OF ACTION

## COUNT I

**Breach of Fiduciary Duty**
**(On Behalf of Plaintiffs and the Nationwide Class)**

314. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

315. Defendant, acting in its various positions including but not limited to expert, advisor, planner, agent, dual agent, and broker, owed Plaintiffs a fiduciary duty by virtue of the special trust and confidence placed in it by Plaintiffs.

316. Plaintiffs placed trust and confidence and otherwise depended on Defendant to perform its obligations to Plaintiffs in its various positions. Defendant's obligations are significantly enhanced because, *inter alia*, Defendant holds worldwide recognition as a leading insurance professional and is the largest casualty insurance provider in the United States;

Defendant held itself out as a professional with respect to the Phoenix products and services, which were the only third-party life and annuity products and services sold by Defendant at that time; Defendant targeted Plaintiffs and Class Members as "affluent high-net-worth customers" with respect to the Phoenix products; Defendant marketed Phoenix products to Plaintiffs and Class Members for their estate planning needs.

317. In Illinois, an insurance producer must not "us[e] fraudulent, coercive, or dishonest practices, or demonstrate[e] incompetence, untrustworthiness or financial irresponsibility in the conduct of business in this State or elsewhere." 215 ILCS § 5/500-70.

318. Defendant's conduct, as alleged above, failed to meet the heightened standards of trust, competence, and care owed in a fiduciary relationship.

319. Defendant breached its fiduciary duties by failing to notify Plaintiffs and Class Members of (1) Phoenix's downgrade; (2) Defendant's decision to stop selling Phoenix life insurance and annuity products; and (3) that Plaintiffs and Class Members' policies and contracts may be threatened due to Phoenix/PHL's poor and deteriorating financial condition.

320. Defendant further breached its fiduciary duties by misappropriating premiums and placing them with Phoenix/PHL when the placement was not in the best interest of Plaintiffs and Class Members.

321. Defendant had a fiduciary duty to protect Plaintiffs and a fiduciary duty to advise Plaintiffs or take other action upon gaining information that Plaintiffs' policies and contracts may be threatened due to Phoenix/PHL's poor, deteriorating, and unsound financial condition.

322. However, Defendant failed to do so. Instead, Defendant explicitly advised its agents not to discuss the stability of Phoenix/PHL.

323. Had Plaintiffs and Class Members been made aware of the true nature of the

Phoenix Products or Phoenix/PHL Variable's unsound financial condition, Plaintiffs and Class Members (1) would have stopped paying premiums on their Phoenix products; and (2) would have exchanged or surrendered their Phoenix products for that of a suitable alternative.

324. Defendant's breaches of its fiduciary duties have resulted in significant losses to Plaintiffs and Class Members. These losses are continuing and increasing.

325. As a direct and proximate result of Defendant's breaches of its fiduciary duties to Plaintiffs, Plaintiffs have been damaged in an amount in accordance with proof at trial.

## COUNT II
**Professional Negligence**
**(On Behalf of Plaintiffs and the Nationwide Class)**

326. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

327. Defendant assumed a fiduciary role to Plaintiffs and Class Members in connection with the Agreement and the Phoenix life insurance policies and annuity contracts.

328. Defendant's professional relationship with Plaintiffs and Class Members was not a one-off, transactional relationship; instead, Defendant maintained a long-time, trusting relationship with Plaintiffs and Class Members.

329. Defendant owes at least the ordinary duty of care that every person owes to prevent harm where that person's actions have created a foreseeable risk of injury. Defendant also owed a heightened duty of care. Plaintiffs were owed a duty of care and were harmed by Defendant's acts and omissions.

330. Defendant failed to notify Plaintiffs and Class Members with respect to (1) Phoenix's downgrade; (2) Defendant's decision to stop selling Phoenix life insurance and annuity products; and (3) that Plaintiffs and Class Members' policies and contracts may be threatened due

to Phoenix/PHL's poor, deteriorating, and unsound financial condition.

331. Defendant continued to collect significant compensation in connection with Plaintiffs and Class Members' Phoenix Products following Phoenix's downgrade and with full knowledge that Phoenix/PHL's financial outlook was poor, deteriorating, and unsound.

332. Defendant continued to collect millions of dollars in compensation in connection with Plaintiffs and Class Members' Phoenix Products, while knowing that Phoenix/PHL had a reduced ability to borrow and that declines in Phoenix/PHL's ratings would likely materially and adversely affect Phoenix/PHL's financials.

333. Defendant should have advised or notified Plaintiffs and Class Members that their policies and contracts may be threatened due to Phoenix/PHL's unsound financial condition. This is especially true given that Defendant stopped selling Phoenix Products through its own distribution system shortly after learning of Phoenix's having been downgraded.

334. Among other things, Defendant knew for approximately fifteen (15) years prior to PHL's rehabilitation that Phoenix was downgraded to speculative grade, and that Plaintiffs had legally protected interests in the Phoenix Products that Defendant continued to collect compensation in connection therewith. Defendant's spokesman conceded that the Phoenix financial strength downgrades by rating agencies was the reason that Defendant stopped selling Phoenix Products.

335. Defendant would have also known that PHL Variable was placed under an order of administrative supervision in spring of 2023, shortly before the May 2024 PHL Rehabilitation.

336. Defendant therefore knew, or reasonably should have known, that failing to notify or advise Plaintiffs and Class Members of changes in Phoenix's financial condition could harm Plaintiffs and Class Members.

337. Had Plaintiffs and Class Members been made aware of the true nature of the Phoenix products or Phoenix/PHL Variable's unsound financial condition, Plaintiffs and Class Members (1) would have stopped paying premiums on their Phoenix Products; and (2) would have exchanged or surrendered their Phoenix products for that of a suitable alternative.

338. As a direct and proximate result of Defendant's negligence and resulting breach of its duty of professional care, Plaintiffs have been damaged in an amount in accordance with proof at trial.

**COUNT III**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS 505/1, *et seq*.**
**(On Behalf of Plaintiff Gordon Jason, Denise Werner, and the Illinois Subclass)**

339. Plaintiff Gordon Jason and Plaintiff Denise Werner repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Illinois Subclass.

340. Plaintiff Jason, Plaintiff Werner, and other Illinois Subclass Members are persons within the context of the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), 815 ILCS 505/1(c).

341. Defendant is a person within the context of the ICFA, 815 ILCS 505/1(c).

342. At all times relevant hereto, Defendant was engaged in trade or commerce as defined under the ICFA, 815 ILCS 505/1(f).

343. Plaintiff Jason, Plaintiff Werner, and the proposed Illinois Subclass are "consumers" who purchased the Products for personal, family or household use within the meaning of the ICFA, 815 ILCS 505/1(e).

344. The ICFA prohibits engaging in any "unfair or deceptive acts or practices … in the conduct of any trade or commerce." ICFA, 815 ILCS 505/2.

345. The ICFA prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices including using deception, fraud, false pretenses, false promises, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or employment of any practice described in Section 2 of the Uniform Deceptive Trade Practices Act ("UDTPA"). 815 ILCS § 505/2.

346. Defendant's conduct in misrepresenting, concealing, suppressing, or omitting materials facts in connection with the PHL products and/or services is a violation of Section 2 of the IFCA.

347. Defendant's conduct, as described herein, took place within the State of Illinois and constitutes unfair or deceptive acts or practices in the course of trade and commerce, in violation of 815 ICFA 505/1, *et seq*.

348. Defendant intended that Plaintiff Jason, Plaintiff Werner, and each of the other Illinois Subclass Members would reasonably rely upon the misrepresentations, concealment, omissions, and other deceptive conduct concerning the Phoenix products.

349. Given that (1) Defendant holds worldwide recognition as a leading insurance professional; (2) Defendant is the largest casualty insurance provider in the United States, and (3) Defendant held itself out as a professional with respect to the Phoenix life insurance and annuity products, which were the only third-party life and annuity products sold by Defendant at that time, Plaintiffs and reasonable consumers trusted and relied on Defendant's representations and omissions regarding the Phoenix products.

350. Defendant's misrepresentations, concealment, omissions, and other deceptive

conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiff Jason and each of the other Illinois Subclass Members to be deceived about the true nature of the Phoenix Products.

351. Plaintiff Jason, Plaintiff Werner, and Illinois Subclass Members have been damaged as a proximate result of Defendant's unfair and deceptive violations of the ICFA and have suffered damages as a direct and proximate result of purchasing the Products and paying premiums on these products.

352. Defendant's misconduct was outrageous and its violative acts were performed with malice, evil motive, or reckless indifference toward the rights of Plaintiff and Class Members. Had Defendant not concealed material information from Plaintiffs and Class Members, Plaintiffs and Class Members would have been able to take retirement security into their own hands.

353. As a direct and proximate result of Defendant's violations of the ICFA, as set forth above, Plaintiff Jason, Plaintiff Werner, and the Illinois Subclass Members have suffered ascertainable losses of money caused by Defendant's misrepresentations, concealment, omissions, and other deceptive conduct with respect to the Phoenix products.

354. Had they been aware of the true nature of the Phoenix products, Plaintiff Jason, Plaintiff Werner, and the Illinois Subclass Members would have stopped paying premiums on their Phoenix products.

355. Had they been aware of the true nature of the Phoenix products, Plaintiff Jason, Plaintiff Werner, and the Illinois Subclass Members would have exchanged or surrendered their Phoenix products for that of a suitable alternative.

356. Based on Defendant's unfair and/or deceptive acts or practices, Plaintiff Jason, Plaintiff Werner, and the Illinois Subclass Members are therefore entitled to relief, including

restitution, actual damages, punitive damages, costs, and attorneys' fees, under 815 ILCS 505/10a. *See* 815 ILCS 505/10a(a) ("Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award *actual economic damages or any other relief* which the court deems proper...") (emphasis added).

**COUNT IV**
**Violation of the California's Unfair Competition Law**
***Bus. & Prof. Code § 17200 et seq.***
**(On Behalf of Plaintiff Nappo, Plaintiff Santos, and the California Subclass)**

357. Plaintiff Nappo, Plaintiff Santos, and Plaintiff Wright repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed California Subclass.

358. California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* (the "UCL"), prohibits "unlawful, unfair, or fraudulent business act or practices" and "unfair, deceptive, untrue or misleading advertising."

359. Defendant regularly transacts business in California and has engaged in misconduct that has had a direct, substantial, foreseeable, and intended effect of injuring people in California.

360. Defendant violated the UCL by engaging in unlawful, unfair, and deceptive business acts and practices as described herein.

361. Defendant chose to withhold material facts from Plaintiff Nappo and California Subclass members regarding Phoenix's downgrade; Defendant's decision to stop selling Phoenix Products and/or services; and that Plaintiff and Class Members' coverage may be threatened due to Phoenix/PHL's poor and deteriorating financial condition.

362. Had they been aware of any of these facts or the true nature of their Phoenix

Products, Plaintiff Nappo and the California Subclass Members would have immediately stopped paying premiums on their Phoenix products.

363. Had they been aware of any of these facts or true nature of the Phoenix products, Plaintiff Nappo and the California Subclass Members would have immediately exchanged or surrendered their Phoenix Products for that of a suitable alternative.

364. Defendant's acts and omissions were likely to deceive reasonable consumers and the public. Reasonable consumers expect to be told about threats facing their Phoenix Products of which Defendant had knowledge. Indeed, Defendant itself stopped selling Phoenix Products after learning about the Phoenix financial strength downgrades by rating agencies.

365. Reasonable consumers also expect that the insurance products and services for which they continuously and regularly pay premiums are not subject to looming and imminent financial threat, unless told otherwise. This is especially true given that Defendant holds worldwide recognition as a leading insurance professional, Defendant is the largest casualty insurance provider in the United States, and because Defendant held itself out as a professional with respect to the Phoenix life insurance and annuity products, which were the only third-party life and annuity products and services sold by Defendant at that time.

366. Consumers like Plaintiff Nappo, Plaintiff Santos, Plaintiff Wright, and the California Subclass Members could not have reasonably avoided economic injury because Defendant's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers, Defendant created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

367. Defendant engaged in these deceptive practices for significant financial gain, which

is unfair, unreasonably dangerous to Plaintiff Nappo, Plaintiff Santos, and the California Subclass members, and not outweighed by any benefit. Omitting and concealing material financial risk facing Plaintiff and California Subclass Members' life insurance and annuity products is unethical, unscrupulous, and offensive. Insurance policies and annuity contracts are designed to provide for consumers like Plaintiff Nappo and Plaintiff Santos when they are at their most vulnerable both personally and financially.

368. Plaintiff Nappo, Plaintiff Santos, and California Subclass members have expended money due to Defendant's acts and have lost money and property due to Defendant's acts.

369. Plaintiffs and California Subclass members' economic injuries were the result of the unfair business practices that are the gravamen of their action.

370. As a result of such unfair business practices and pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff Nappo and Plaintiff Santos, on behalf of themselves and the California Subclass, seek an order requiring Defendant to (a) provide restitution; and (b) disgorge all revenues, earnings, profits, compensation, and other benefits obtained by Defendant as a result of its unfair business practices in violation of the UCL. Plaintiff Nappo, Plaintiff Santos, and the California Subclass seek all other relief allowable under the UCL.

371. Plaintiff Nappo, Plaintiff Santos, and the California Subclass also seek attorneys' fees pursuant to California Code of Civil Procedure § 1021.5 ("a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if" under certain circumstances).

//

//

//

**COUNT V**
**Violation of New Jersey's Consumer Fraud Act**
**(On Behalf of Plaintiff Rowe and the New Jersey Subclass)**

372. Plaintiff Rowe repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed New Jersey Subclass.

373. The New Jersey Consumer Fraud Act ("NJCFA") prohibits "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice… ." N.J.S.A. § 56:8-2.

374. Plaintiff Rowe and New Jersey Subclass members are consumers who purchased PHL insurance policies from Defendant for personal, family, or household use.

375. "[NJCFA's] language is ample enough to encompass the sale of insurance policies as goods and services that are marketed to consumers." *Granelli v. Chicago Title Ins. Co.*, 569 F. App'x 125, 133 (3d Cir. 2014) (quoting *Lemelledo v. Beneficial Mgmt. Corp. of America,* 150 N.J. 255, 696 A.2d 546, 551 (1997).

376. Defendant intentionally and knowingly misrepresented and omitted material facts regarding the Products in order to induce Plaintiff Rowe and New Jersey Subclass Members to purchase the Phoenix Products and to continue to pay premiums on the Phoenix Products. This conduct constitutes consumer fraud within the meaning of the NJCFA.

377. Defendant knowingly chose to withhold and misrepresent material facts from Plaintiff Rowe and New Jersey Subclass members regarding the state of Phoenix at the time of sale of the Products; Phoenix's downgrade; Defendant's decision to stop selling Phoenix Products and/or services; and that Plaintiff and Class Members' coverage may be threatened due to Phoenix/PHL's poor and deteriorating financial condition.

378. Defendant did so with the intent that Plaintiff and New Jersey Subclass Members would rely on the material omissions and misrepresentations.

379. Defendant's acts were deceptive in a material way in that they intended to, and did induce Plaintiff and New Jersey Subclass Members to purchase the Phoenix Products under false pretenses, and continue to pay premiums for their Phoenix Products under false pretenses.

380. Had they been aware of any of these facts or the true nature of their Phoenix Products, Plaintiff Rowe and the New Jersey Subclass Members would not have purchased the Phoenix Products and/or would have immediately stopped paying premiums on their Phoenix Products.

381. Had they been aware of any of these facts or true nature of the Phoenix products, Plaintiff Rowe and the New Jersey Subclass Members would have immediately exchanged or surrendered their Phoenix Products for that of a suitable alternative.

382. Defendant's acts and omissions were likely to deceive reasonable consumers and the public. Reasonable consumers expect to be told about threats facing their Phoenix Products of which Defendant had knowledge. Indeed, Defendant itself stopped selling Phoenix Products after learning about the Phoenix financial strength downgrades by rating agencies, yet still continued to sell the Products to Plaintiff Rowe and New Jersey Subclass Members, and continued to receive payments on the policies from Plaintiff Rowe and New Jersey Subclass Members.

383. Reasonable consumers also expect that the insurance products and services for which they purchase and continuously and regularly pay premiums are not subject to looming and imminent financial threat, unless told otherwise. This is especially true given that Defendant holds worldwide recognition as a leading insurance professional, Defendant is the largest casualty insurance provider in the United States, and because Defendant held itself out as a professional with respect to the Phoenix life insurance and annuity products, which were the only third-party life and annuity products and services sold by Defendant at that time.

384. Consumers like Plaintiff Rowe and the New Jersey Subclass Members could not have reasonably avoided economic injury because Defendant's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers, Defendant created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

385. Defendant engaged in these deceptive practices for significant financial gain, which is unfair, unreasonably dangerous to Plaintiff Rowe and the New Jersey Subclass members, and not outweighed by any benefit. Omitting and concealing material financial risk facing Plaintiff and New Jersey Subclass Members' life insurance and annuity products economically and emotionally injured Plaintiff Rowe and New Jersey Subclass Members. Insurance policies and annuity contracts are designed to provide for consumers like Plaintiff Rowe when they are at their most vulnerable both personally and financially.

386. As a direct and proximate result of Defendant's wrongful conduct in violation of the NJCFA, Plaintiff and members of the New Jersey Subclass have suffered and continue to suffer ascertainable losses.

387. On behalf of herself and other members of the New Jersey Subclass, Plaintiff Rowe seeks to recover actual damages, treble damages, costs, attorneys' fees, and other damages to be determined at trial. *See* N.J.S.A. § 56:8-19.

**COUNT VI**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Nationwide Class)**

388. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

389. Defendant received benefits from Plaintiffs and Class Members and unjustly retained those benefits at their expense. For example, Plaintiffs and the Class Members paid premiums for the Phoenix Products that earned Defendant millions of dollars in compensation.

390. Said compensation was conferred on Defendant by Plaintiffs and Class Members under a mistake of fact due to Defendant's misrepresentations and/or omissions, and unlawfully obtained to the detriment of Plaintiffs and the Class Members.

391. Defendant has been unjustly enriched in that it received and retained the benefit of funds to which it was not entitled and received in violation of its fiduciary and professional duties, and also in violation of state consumer protection laws.

392. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct harmed Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

393. Allowing Defendant to retain the aforementioned benefits violates fundamental principles of justice, equity, and good conscience. As a sophisticated insurance company that had actual knowledge of Phoenix's poor, deteriorating, and unsound financial condition, Defendant

was well aware that its conduct violated its duties to Plaintiffs and Class Members and exposed them to tremendous financial risk.

394. Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and Subclass members is unjust and inequitable, Defendant must pay restitution to Plaintiff and the Subclass members for its unjust enrichment.

395. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds it received, and such other relief as the Court may deem just and proper.

**COUNT VII**
**Breach of the Covenant Of Good Faith And Fair Dealing**
**(On Behalf of Plaintiffs and the Nationwide Class)**

396. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

397. Plaintiffs and Class Members contracted with Defendant for professional expertise, advising, planning, and services regarding the Phoenix life insurance and annuity products.

398. State Farm agents got paid commissions for recommending that their high-net-worth clients purchase Phoenix life insurance policies and annuity contracts. Those commissions were paid upfront and overtime in the form of trailer commissions.

399. Every contract carries with it an implied covenant of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. The covenant requires faithfulness to an agreed common purpose and consistency with the justified expectations of the other party to a contract.

400. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

401. Even though State Farm agents knew about Phoenix's financial troubles, State Farm agents were directed to not share—and did not share—that critical information with their customers, including Plaintiffs and Class Members.

402. Instead, State Farm and its agents allowed Plaintiffs and Class Members to continue paying millions of dollars of funds into an insurance company that was doomed to fail and did, in fact, fail.

403. Defendant has breached the covenant of good faith and fair dealing in the contract through its policies and practices as to Phoenix life insurance and annuity products as alleged herein.

404. For example, Defendant harmed consumers by failing to notify Plaintiffs and Class Members of (1) Phoenix's downgrade; (2) Defendant's decision to stop selling Phoenix products; and (3) that Plaintiff and Class Members' policies and contracts were threatened due to Phoenix/PHL's poor and deteriorating financial condition.

405. Defendant abused its position of superior knowledge and sophistication to collect commissions and compensation in connection with Plaintiffs' and Class Members' life insurance and annuity products.

406. Plaintiffs and Class Members have sustained damages as a result of Defendant's breaches of the covenant of good faith and fair dealing.

49. Plaintiffs and Class Members are thus entitled to relief in the form of damages, restitution, injunctive and other appropriate equitable relief.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and all others similarly situated, seek judgment against Defendant, as follows:

(a) For an order certifying the Class and Subclasses (the "Classes") under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as representatives of the Classes, and naming Plaintiffs' attorneys as Class Counsel to represent the Classes;

(b) For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(c) For actual damages Plaintiffs and Class Members suffered, as measured by the difference in value of their policies and contracts at the time of purchase and the value of their policies and contracts as of the present;

(d) For equitable relief, including the imposition of a constructive trust or other equitable remedies such as restitution, an accounting, or disgorgement of ill-gotten gains;

(e) For statutory damages in amounts to be determined by the Court and/or jury;

(f) For prejudgment interest on all amounts awarded;

(g) For an order awarding reasonable attorneys' fees and expenses and costs of suit; and

(h) Grant any other relief as the Court deems appropriate to remedy the violations.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury for all the claims asserted in this Complaint so triable.

Date: March 20, 2026

Respectfully submitted,

By: */s/ Yitzchak Kopel*
Yitzchak Kopel

**BURSOR & FISHER, P.A.**
Yitzchak Kopel
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: ykopel@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (IL Bar No. 6337165)
50 Main St., Ste. 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com

**EDWARD STONE LAW P.C.**
Edward S. Stone*
700 Canal Street, 1st Floor
Stamford, CT 06902
Telephone: (203) 504-8425
Facsimile: (203) 348-8477
E-Mail: eddie@edwardstonelaw.com

*Attorneys for Plaintiffs*

**Pro Hac Vice application forthcoming*